BRUCE NEAL SALZMAN, PAUL BLINKEN, JEFFREY
BLINKEN AND MARCIA BLINKEN v.
STATE OF MARYLAND

[Nos. 857, 900, 909, 936 and 1013, September Term, 1980.]

*Decided June 4, 1981.*

The cause was argued before Lowe, Liss and Wilner, JJ.

*Joseph F. Murphy, Jr.,* with whom was *Carmina Szunyog* on the brief, for appellant Salzman. *H. Russell Smouse,* with whom was *Kathleen M. Sweeney* on the brief, for appellants Paul Blinken and Marcia Blinken. *Harold Buchman* for appellant Jeffrey Blinken.

*'Thomas P. Barbera, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Thomas E. Hickman, State's Attorney for Carroll County, Frank D. Coleman, Assistant State's Attorney for Carroll County, Charles A. Ruppersberger, III* and *David F. Mister, Special Assistant State's Attorneys for Carroll County, Robert S. Rothenhoefer, State's Attorney for Frederick County* and *Mary Ann Stepler, Assistant State's Attorney for Frederick County,* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

In January of 1978 Baltimore County Police began an investigation into what was believed to have been the

largest illegal drug operation ever investigated by State law enforcement officials. The investigation concluded in the indictments of some twenty individuals, spread throughout four different counties, who were involved on various levels in an operation which dealt with literally tons of marijuana, a quantity of cocaine and methaqualone, and so much United States currency that cash exchanges by members of the group were calibrated by the suitcase full. Appellants in this consolidated appeal are four members — three of them principals — of the drug operation. As their nomenclature is reminiscent of a nursery rhyme, their relationships correspond to a trite western saga. All are closely related by blood and marriage.

Police were first alerted to the operation on January 6, 1978, when one Victor Tomich went to the Baltimore County Police Headquarters and confessed to a larceny he had committed some nine days previously. Tomich related that he had removed approximately $100,000 in cash and a bag of marijuana from a safe in the home of appellants Paul and Marcia Blinken. After explaining that he and his wife, Mindy Tomich (the sister of Marcia Blinken), lived in a house trailer on the Baltimore County property of Paul and Marcia Blinken, Victor divulged to the police that Paul and Marcia Blinken, along with Paul Blinken's brothers Neal and Jeffrey and one of their cousins (later identified as appellant Bruce Salzman), were operating a large-scale illegal drug conspiracy.

From this initial meeting and two subsequent interviews with Victor and Mindy Tomich, it was learned that the Blinkens ran what was described as a "corporation" dealing in illegal drugs, with members of the corporation residing and operating throughout the State. The Tomichs had personally observed bales of marijuana, suitcases full of methaqualone, and quantities of cocaine stored at the home of Paul and Marcia Blinken. They had further seen these drugs delivered to and used and distributed at the Blinkens' residence. Among other personal observations by the Tomichs were (1) the sale of cocaine by Paul Blinken, (2) firearms carried by Paul Blinken, (3) frequent drug

deliveries and traffic in and out of Paul and Marcia Blinken's home, and (4) drug use at the residence of Jeffrey Blinken. Mindy Tomich further informed the police that on one occasion in 1974 Paul Blinken had arranged for her to pick up two suitcases full of marijuana at his father's house in Florida. Upon her return with the drugs, she was paid $500 by Paul Blinken for her efforts.

A five-week investigation by Baltimore County Police detectives ensued, and on February 24, 1978 Victor and Mindy Tomich along with three Baltimore County Police detectives personally appeared before Judge Frank E. Cicone in the Circuit Court for Baltimore County and submitted a detailed affidavit which served as the basis for an application by the State's Attorney for Baltimore County for an order authorizing a wiretap on the telephone of appellants Paul and Marcia Blinken. Judge Cicone issued the order. Thereafter, on March 23, 1978, the Tomichs accompanied members of the Baltimore County Police Department and the Maryland State Police (who had been working with Baltimore County on the Blinken investigation) to Carroll County where they joined Corporal Fred A. Settle of the State Police to submit an affidavit in support of an *ex parte* wiretap authorization on the phone of Jeffrey Blinken in Carroll County. Judge Edward O. Weant granted the order. The Baltimore County wiretap was subsequently extended on March 28, 1978 and April 21, 1978, and the Carroll County surveillance was once extended by Judge Weant on April 20, 1978.

Based on the information obtained from the Tomichs and on a number of intercepted telephone conversations couched in carefully coded language and interpreted by experts as being drug related, search warrants were ultimately obtained and executed on April 28, 1978 and May 1, 1978 for the premises and vehicles of Bruce Salzman, Jeffrey Blinken, and Paul and Marcia Blinken. The police seized 229 pounds of marijuana with an approximate street value of $145,920, 2 grams, 700 milligrams of cocaine with a significant purity of 95%-100%, and assorted drug paraphernalia from Paul and Marcia Blinken's; 400 pounds

of marijuana with an estimated street value of $180,000, one ounce of cocaine with an approximate street value of $2,000, and 500 quaalude tablets with an approximate street value of $1,000 from the truck and residence of Bruce Salzman, plus $598,000 in cash found in the trunk of an unlicensed Mercedes Benz parked within the Salzman curtilage; five and one-half pounds of marijuana having an estimated street value of $2,475, two ounces of cocaine with an approximate street value of $4,000, 123 quaalude tablets with a street value of $246 and $101,595 in cash packets of $1,000 per wrapper from the residence of Jeffrey Blinken; and approximately two tons of marijuana plus three vehicles fictitiously registered, from the group's warehouse in Anne Arundel County.

A three-count indictment was filed against appellants Bruce Salzman, Marcia Blinken, and Paul Blinken in the Circuit Court for Carroll County [1], a thirteen-count indictment was filed in the Circuit Court for Carroll County against appellant Jeffrey Blinken and two separate criminal informations charging Bruce Salzman with ten and three counts respectively were filed in the Circuit Court for Frederick County.

Numerous and extensive pre-trial motions to suppress evidence derived from the wiretaps and from the search and seizures which had relied thereon for probable cause were filed by the multitude of defendants originally charged in connection with the uncovered drug operation.[2] On November 3, 1978, in a unique order, Chief Judge Robert C. Murphy of the Court of Appeals consolidated the cases below to allow all motions and arguments which could possibly be made before the various trials to be heard by one circuit court judge sitting as a judge for all four jurisdictions then involved. All pre-trial motions were then heard over five

---

**1.** Dated April 26, 1979, this was the second indictment filed against these three appellants. The first indictment against them, filed on February 24, 1978, had been dismissed for failure to name known co-conspirators.

**2.** Although this appeal concerns only four individuals, originally involved at the consolidated pre-trial hearings were sixteen defendants and eighteen attorneys.

days in the Circuit Court for Baltimore County by Judge Paul E. Alpert, sitting as a judge for the circuit courts for Carroll, Queen Anne's, Frederick and Baltimore Counties. On June 8, 1979 Judge Alpert filed an extensively researched and meticulously reasoned 121-page opinion denying all motions pertinent to this appeal.

Appellants were then tried in the Circuit Courts for Carroll and Frederick Counties where they unsuccessfully sought rehearings on their motions to suppress and specifically repeated their objections to the means by which the incriminating evidence had been acquired. None offered any defense on the merits of the cases before them. All were convicted on various violations of the laws relating to controlled dangerous substances.

The present appeals were consolidated for briefing and argument, primarily because all four appellants raise the common issue of Judge Alpert's denial of the motions to suppress the wiretap evidence and subsequent evidence derived therefrom. Additionally, appellants Salzman and Jeffrey Blinken assert violations of their constitutional right to be free from double jeopardy, appellants Paul Blinken and Jeffrey Blinken raise sufficiency of the evidence arguments, and appellants Paul Blinken, Jeffrey Blinken, and Bruce Salzman contend that their waivers of the right to trial by jury were defective.[3] After reviewing the voluminous records on this appeal and the applicable law, we will affirm appellants' convictions.

---

3. At oral argument, counsel for appellant Paul Blinken further raised an issue of prosecutorial vindictiveness which was not addressed in appellants' brief. While he would excuse those failures because our opinion in *Adams v. State,* 48 Md. App. 447 (1981), was filed a month after appellants' brief was received by this Court and was printed in *The Daily Record* only three days before argument herein, we note that neither did Adams have the benefit of the *Adams* opinion when he brought his claim of prosecutorial vindictiveness to us. The law on prosecutorial vindictiveness existed prior to *Adams;* our opinion merely interpreted that law. To allow appellant to raise that issue now would be allowing him to argue an issue to which the State has had no real opportunity to respond. We therefore decline to address the issue. Md. Rule 1046 f; *See, Pride Mark Realty v. Mullins,* 30 Md. App. 497, 509-10, *cert. denied,* 278 Md. 730 (1976).

## I. The Wiretaps

## A. Exhaustion

All four appellants contend that the police failed to exhaust normal investigative procedures before seeking wiretap authorizations and that therefore the wiretaps were obtained in violation of applicable federal and state statutes. Section 10-408 (a) (3) of Maryland's wiretap and electronic surveillance statute, Md. Cts. & Jud. Proc. Code Ann. §§ 10-401 — 10-412, and its federal counterpart § 2518 (1) (c) of Title III of the Omnibus Crime Control & Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, (hereinafter Title III), set forth the identical requirement that every application for an *ex parte* order authorizing wiretap interception must demonstrate:

"... whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

The Title III preconditions for obtaining wiretap authority, and particularly the exhaustion requirement (18 U.S.C. § 2518 (1) (c)) after which Maryland's § 10-408 (a) (3) is modeled, were established by Congress "to make doubly sure that the statutory authority [to wiretap] be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *United States v. Giordano,* 416 U.S. 505, 515 (1974). Specifically, the exhaustion requirement's basic purpose is to assure that wiretapping is "not ... routinely employed as the initial step in criminal investigation." *Id.* And as pointed out by Chief Judge Gilbert in *Calhoun v. State,* 34 Md. App. 365, 376-77 (1977), the requirement mandates strict compliance:

"The affidavit *must* demonstrate to the issuing judge that normal investigative measures have been tried and failed, *or* they are unlikely to be successful, *or* that their use is too perilous to the investigators. [Emphasis in original]."

The State, however, need not exhaust every conceivable investigative possibility before seeking a wiretap order. *Trovinger v. State,* 34 Md. App. 357, 361, *cert. denied,* 280 Md. 736 (1977). Rather, the exhaustion requirement is to be tested in a "practical and common sense fashion,"*Bell v. State,* 48 Md. App. 669, 673 (1981) (*citing with approval, Calhoun v. State, supra* at 374) since its purpose is "simply . . . to assure that wiretapping is not resorted to where traditional investigative techniques would suffice." *United States v. Kahn,* 415 U.S. 143, 153 n. 12 (1974). **Chief Justice** Gilbert[4] in *Calhoun* noted that the origin of this common sense, pragmatic approach was found in the legislative history of Title III, which history provides:

> " 'Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What [the exhaustion] provision envisions is that the *showing be tested in a practical and common sense fashion* [citation omitted].' " *Calhoun, supra* at 374.

Consequently, the State "need not prove to a certainty that [normal investigative] techniques will not succeed if — as stated in the statute — [they] *'reasonably* appear to be unlikely to succeed.' " *Bell, supra* at 3. (Emphasis added.)

### (i) Baltimore County

Applying the pragmatic approach to the first Baltimore County affidavit, it is clear that the exhaustion requirement was met. Contrary to appellants' contention that it merely contained "boiler-plate verbiage," the 34-page affidavit outlined with great detail the investigative procedures that the police had unsuccessfully attempted to use, and why the efforts had failed in light of the objectives, which included

---

4. For an exhaustive "Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law," *see* Chief Judge Richard P. Gilbert's article, 8 U. Balt. L. Rev. 183 (1979).

identification of the alleged conspiracy's sources of supply and higher-echelon figures.[5]

Intermittent stationary surveillance of Paul Blinken's home and place of business over a five-week period had predictably failed to reveal identities of any "higher-ups," sources of supply, or co-conspirators; telephone toll records and informant tips, indicated that Paul Blinken was associated with known and convicted narcotics law violators, but were not sufficient to prove a criminal conspiracy or to identify sources of supply; a check on criminal arrest records rendered no information; requests to the Tomichs to introduce undercover agents to Paul Blinken were fruitless because the Tomichs refused, explaining that Blinken only dealt with old friends and associates; intermittent mobile surveillance of Paul Blinken proved futile and rendered no evidence; the Tomichs' access to Paul and Marcia Blinken's house had been curtailed since the disappearance of the Blinkens' money from their safe; and inquiries to other reliable police informants for information on Paul Blinken or any of his co-conspirators met with negative results.

Besides detailing the above unsuccessful efforts, the police set forth an exhaustive list in their affidavit to Judge Cicone outlining why other investigative techniques "reasonably appear[ed] to be unlikely to succeed if tried or to be too

---

**5.** Based on *Baldwin v. State*, 45 Md. App. 378 (1980), *aff'd*. 289 Md. 635 (1981), appellants attempt to argue that these objectives were improper. In *Baldwin*, similar to the instant case, the wiretap affiants contended that without a wiretap they would be unable to learn "the identities and/or degree of participation of 'higher-ups' " and the identity of the source of a "clandestine laboratory" to manufacture controlled dangerous substances, which was then being investigated. There, Chief Judge Gilbert noted that probable cause for the wiretap was "not so clear" because the police in fact knew the source of supply for the operation and had merely speculated that higher-ups existed since "[t]here was not one scintilla of fact in the affidavit to give rise to a reasonable inference that 'higher-ups' existed." 45 Md. App. at 392.

The present case is clearly distinguishable, however, because the police did not know the sources of the drug "corporation's" supply and from (1) the Tomichs' account of the Blinkens' drug importation and (2) the evidence derived from checking telephone toll records which revealed that the suspects were in frequent contact with known and convicted narcotics law violators in Maryland and other states, the police had probable cause to believe that unknown sources of supply, co-conspirators, and "higher-ups" in fact existed. The objectives of the wiretap were therefore valid.

dangerous." A "blind buy" (i.e., an attempt to purchase drugs from the Blinkens without prior introduction) appeared likely to fail in light of the Tomichs' information that Paul Blinken only sold to long-time associates (moreover, a "blind buy" would not aid in identifying sources of supply or "higher-ups"); because the Blinken house was in an isolated area of Baltimore County, long-term stationary surveillance would likely be detected and would fail at any rate to reveal sources of supply and "higher-ups"; infiltration of the conspiracy appeared impossible since Paul Blinken dealt only with long-term associates; execution of a search and seizure warrant would not aid in determining co-conspirators; and further checks of toll records, implementation of a "pen register," or electronic eavesdropping of conversations between the Blinkens and the Tomichs (with the permission of the Tomichs) all appeared unlikely to reveal sources of supply and higher-echelon figures in the suspected conspiracy. In sum, it was clear from the information set forth in the affidavit, that normal investigative procedures would "reasonably" be unlikely to succeed. The February 24, 1978 original application for wiretap authorization in Baltimore County more than met the exhaustion requirement.

Appellants further argue that the March 28, 1978 and April 21, 1978 applications to extend the Baltimore County wiretap suffered from the same defects of conclusory, "boiler-plate" language used in an attempt to satisfy the § 10-408 (a) (3) exhaustion requirement.

Each of the affidavits in support of the Baltimore County extensions, however, outlined in detail similar to that in the original affidavit, why traditional investigative techniques had failed and why others reasonably appeared unlikely to succeed. Furthermore, the two Baltimore County extension affidavits incorporated by reference the original application's affidavit. Under our holding in *Ward v. State,* 40 Md. App. 410, 413 (1978), even if they would be defective standing alone, electronic surveillance applications incorporating a previously valid application and affidavit for wiretapping the *same individuals* at the *same location,* are

deemed to comply with § 10-408 (a) (3) when all the circumstances requiring the first wiretap are clearly present with respect to the second. The objection to the Baltimore County extension applications therefore fails.

### (ii) Carroll County

On March 23, 1978 State Trooper Settle and the Tomichs submitted an affidavit in the Circuit Court for Carroll County in support of the Carroll County State's Attorney's application for an *ex parte* order to wiretap Jeffrey Blinken's phone. The objectives of the wiretap were identical to those in the Baltimore County application and the unsuccessful investigation using traditional police techniques had been equally extensive. Corporal Settle summarized those attempts, which had included intermittent stationary surveillance of Jeffrey Blinken's home for a three-week period; checking toll and arrest records; requesting the Tomichs and a confidential informant to introduce an undercover agent to Jeffrey Blinken so as to make a "blind buy"; intermittent mobile surveillance; and requesting a confidential informant to testify against Blinken in court. An exhaustive list of investigative techniques which reasonably appeared unlikely to succeed was similarly set forth (e.g., the isolated location of Jeffrey Blinken's house prohibited long-term stationary surveillance; mobile surveillance was impossible due to Jeffrey Blinken's erratic driving habits; execution of a search and seizure warrant would not aid in identifying sources of supply and "higher-ups"; a "blind buy" of drugs from Jeffrey Blinken and/or infiltration of his conspiracy was impossible because he only dealt with long-term associates; etc.).

Under the pragmatic, common sense approach espoused by *Calhoun, supra,* and *Bell, supra,* we thus find that the original Carroll County application met the exhaustion requirement of § 10-408 (a) (3). We further find that the April 20, 1978 extension application complied with the exhaustion test for the same reasons that the Baltimore

County extensions were found to comply. *See, text, supra* at 10.

## B. Disclosure

Appellants' second major contention is that the State's Attorneys for Baltimore and Carroll Counties violated the disclosure requirement of § 10-408 (a) (5). On March 28, 1978 the State's Attorney for Baltimore County applied for a second wiretap on the phone of Paul and Marcia Blinken. The application failed to notify the issuing judge that a wiretap on the phone of Jeffrey Blinken had been ordered by Judge Weant in Carroll County on March 23, 1978. After exhaustive pretrial hearings on the issue, Judge Alpert found as a matter of fact that the Baltimore County Assistant State's Attorney responsible for the extension application had had no actual knowledge of the prior Carroll County order, even though a Baltimore County police detective who was an affiant in support of the extension did have such knowledge. Judge Alpert further found as fact that the Assistant State's Attorney had not intentionally failed to apprise himself of the Carroll County order.

Appellants do not contest the findings of fact, but interpretively argue that § 10-408 (a) (5) requires the applicant for wiretap authorization to disclose all previous orders not only within his actual knowledge, but also any within the collective knowledge of police investigators. Under appellants' theory, evidence derived from the Baltimore County extensions would have to be suppressed pursuant to § 10-408 (i) (1) (ii), because § 10-408 (a) (5)'s disclosure requirement is a mandatory pre-interception condition requiring strict compliance. *See, State v. Siegel,* 266 Md. 256 (1972); *Poore v. State,* 39 Md. App. 44, *cert. denied,* 282 Md. 737 (1978).

The answer to this issue lies in the clear and unambiguous language of § 10-408 (a) (5). It is a fundamental rule of statutory construction that when language in a statute is plain, clear and unambiguous, courts must give it force, and no construction should be made against the express letter

thereof. *Williams v. State,* 144 Md. 18 (1923). In the absence of ambiguity, we must confine ourselves to construction of the statute as written, *Gov't Employees v. Ins. Comm'r,* 273 Md. 467, 482 (1975), as the language used is conclusively presumed to express the intent of the legislature. *Gietka v. County Executive,* 283 Md. 24 (1978). This is particularly applicable where the Court of Appeals has admonished that,

> "The [wiretap] statute sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path." *State v. Siegel, supra* at 274." (Emphasis in original.)

We must therefore follow strictly the precise words of the statute.

Section 10-408 (a) (5) provides that each application for wiretap authority shall include:

> "A full and complete statement of the facts concerning all previous applications *known to the individual authorizing and making the application,* made to any judge for authorization to intercept wire or oral communications involving the same persons, facilities or places specified in the application and the action taken by the judge on each application." (Emphasis added.)

Its plain language indicates that only those prior applications "known to the individual" applicant for an *ex parte* order need be set forth. Significantly, it does not require the applicant to divulge simply "all previous orders" or "all previous wiretaps within the knowledge of any investigators working on the investigation." *Contrast,* Md. R. 741 (a) (3), which requires the State's Attorney's Office to disclose during discovery any "material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who regularly report or with reference to the particular case have reported to his office."

Although neither we nor our Court of Appeals has addressed the issue, the Sixth Circuit Court of Appeals, when faced with a situation almost identical to the one before us, held that the disclosure requirement of 18 U.S.C. § 2518 (1) (e) (the federal counterpart to § 10-408 (a) (5)) had not been violated where federal officers had failed to disclose a prior wiretap of which they lacked actual knowledge, even though more diligent investigation would have revealed it. *United States v. O'Neill,* 497 F.2d 1020 (6th Cir. 1974). Notably, the court held:

> "Appellants concede that the federal officers who requested the April 18 order did not know of the January 7 and 27 orders, but maintain that they should have been more diligent in learning of these orders. Section 2518 (1) (e) requires disclosure of all previous applications 'known to the individual authorizing and making the application.' *Since the application disclosed the only previous authorization known to the applicants and to the Acting Attorney General who authorized the application, there was complete compliance with the requirement of the Statute." Id.* at 1025-1026. (Emphasis added.)

From our strict construction of the express language of § 10-408 (a) (5), and the persuasive reasoning of the *O'Neill* holding which applied the same strict construction, we conclude that there was no violation of the disclosure requirement by the Baltimore County State's Attorney's Office.[6]

---

**6.** We further note that § 10-408 (a) (5)'s clear language only requires disclosure of previous wiretap applications if they "involv[e] the same persons, facilities or places" as are involved in the subsequent application. Here the Carroll County wiretap was on Jeffrey Blinken's residential telephone while the Baltimore County tap was on the home phone of Paul and Marcia Blinken. But while the facilities and locations for the two taps were clearly different, both applications set forth substantially identical lists of persons whose communications were sought for interception (e.g., *both* applications listed Jeffrey, Marcia and Paul Blinken as subjects for interception). Thus, it could be argued that the applications did involve the same persons, as anticipated under § 10-408 (a) (5).

Appellants raise an argument for the first time on appeal that the Carroll County State's Attorney also violated § 10-408 (a) (5) when in his initial March 23, 1978 application to Judge Weant, he failed to reveal that the Baltimore County tap which had already been initiated was going to be extended in the near future. While we need not address this contention, Md. Rule 1085, *Von Lusch v. State,* 279 Md. 255 (1977), we note that it is contrary to the clear and explicit language of § 10-408 (a) (5), which merely requires a full and complete statement of facts concerning all *previous* applications known to the applicant for wiretap authorization. The Carroll County State's Attorney did notify Judge Weant of the Baltimore County tap already in progress, and thus complied with § 10-408 (a) (5).

## C. Minimization

Appellants next contend that the Baltimore County Police failed to minimize the interception of non-pertinent conversations on the phone of Paul and Marcia Blinken. At the hearings on their pre-trial motions to suppress, however, the defendants below did agree to stipulate that the Baltimore County detectives conducting the tap (1) had all read and signed a minimization plan, (2) had conducted spot-monitoring by deactivating all recorders and turning their volume completely down for alternating twenty to thirty-second intervals when calls were determined to be non-pertinent to the drug operation, (3) were allowed up to ten minutes of constant monitoring before spot-monitoring was to begin, and (4) had known during the wiretapping that the alleged conspiracy involved more than three persons. Testimony at the hearings further revealed that the detectives had attended a lecture by the State's Attorney's Office on minimization and that after a period of time spot-monitoring was increased to sixty-second intervals and the midnight surveillance shift was eliminated, police thereby intercepting no phone calls between midnight and seven a.m. It was also pointed out by the narcotics detectives who testified at the pre-trial hearings that special problems

are incurred when wiretapping is used in narcotics investigation because coded language is frequently used by drug dealers, and telephone conversations among them frequently start off as personal and irrelevant, but then suddenly switch to short periods of drug-related conversation.

In compliance with the dictates of the Fourth Amendment, both § 2518 (5) of Title III and § 10-408 (c) of the Maryland statute provide:

"... Every [wiretap] order and extension thereof shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interceptions of communications not otherwise subject to interception. ..."

The Court of Appeals has held that "[t]he standard for compliance with the requirement to minimize is the overall reasonableness of the totality of the conduct of the monitoring agents in light of the purpose of the wiretap and the information available to the agents at the time of the interception." *Spease & Ross v. State,* 275 Md. 88, 99 (1975). *Accord, Poore v. State, supra* at 65. Endorsing the same objective, overall reasonableness test for minimization, the Supreme Court has held that "because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law which will decide every case." *Scott v. United States,* 436 U.S. 128, 139, *reh. denied,* 438 U.S. 908 (1978). After synthesizing the multitude of cases on minimization, however, Chief Judge Murphy has set forth a list of factors to be used as guidelines for determining the reasonableness of minimization. These include:

"(1) the nature and scope of the crime being investigated; (2) the sophistication of those under suspicion and their efforts to avoid surveillance through such devices as coded conversations; (3) the location and operation of the subject telephone; (4) government expectation of the contents of the call; (5) the extent of judicial supervision; (6) the duration of the wiretap; (7) the purpose of the

wiretap; (8) the length of the calls monitored; (9) the existence of a pattern of pertinent calls, which the monitoring agents could discern so as to eliminate the interception of non-pertinent calls; (10) the absence of monitoring of privileged conversations." *Spease & Ross, supra* at 100.

Applying those factors to the circumstances in the instant case, we find that they clearly weigh in the State's favor. Here the nature and scope of the crime being investigated was a widespread, sophisticated drug conspiracy. In such cases, "courts generally permit a greater latitude to officials conducting a sweeping investigation and have held a wider range of intercepted calls to be pertinent." *Poore, supra* at 67; *Accord, Scott, supra* at 140. Further, intercepted conversations couched in coded, guarded and ambiguous language indicated the sophistication of the conspirators and understandably made the discerning of non-pertinent calls and patterns of calls more difficult. *Scott, supra* at 140; *Spease & Ross, supra* at 102; *Poore, supra* at 67-68. And where, as here, the legitimate purpose of an investigation is to identify sources of drug supplies and higher-echelon dealers, more extensive surveillance is justified. *Poore, supra* at 67.

Another factor to be weighed, the location of the tapped phone likewise leans in the State's favor. While generally one has a greater expectation of privacy when using one's home telephone than one would have when using a public phone or one used exclusively for criminal acts, the Blinken phone was used as an instrument in the furtherance of their conspiracy and their residence was a crucial place for the storage and distribution of illegal drugs. As such, the "location and operation of the subject telephone" warranted greater interception. *Spease & Ross, supra* at 102; *Poore, supra* at 69.

Finally, the "extent of judicial supervision" reinforces our belief that the wiretap here was properly minimized. Judge Cicone had instructed Detective Peregoy, the Baltimore County detective in charge of the wiretap operation, to

render progress reports at four-day intervals. The detective testified, moreover, that he reported to the judge at intervals of fewer than four days and that Judge Cicone had visited the wiretap plant to personally observe its operation on some six different dates while the tap was in progress.

From the above factors, we think it clear that minimization was adequate. As indicative of a lack of minimization, appellants' emphasize that only a "minimal percentage" of the total calls intercepted on the Blinken phone were actually pertinent to the drug investigation. With regard to a similar argument made in *Scott v. United States,* another narcotics conspiracy case, the Supreme Court responded:

> "We agree with the Court of Appeals that blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer. Such percentages may provide assistance, but there are surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable. The reasons for this may be many. Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination." 436 U.S. at 140.

We find this language equally applicable to the present case.

### D. Progress Reports to Issuing Judge

Section 10-408 (f) mandates that when wiretap authorization is granted, the issuing judge shall provide in his order for interception a requirement that police make periodic reports to him showing what progress has been made toward attaining the authorized objective. The statute further states that "[t]he reports shall be made at the

intervals the judge requires." In the case at bar, the Baltimore and Carroll County wiretap orders and the extensions thereto, contained the following:

"ORDERED that at present, the [Baltimore County Police Department/Maryland State Police] *shall be required to report to the Court* on what progress has been made toward the achievement of the authorized objective and the need for continued interception *at a time period and in a manner as designated by the Court.*" (Emphasis added.)

Although they have not preserved their point for appeal (and we thus could decline to address it, Md. Rule 1085, *Von Lusch, supra*), appellants argue that under the recent decision of the Court of Appeals in *Baldwin v. State,* 289 Md. 635 (1981), *aff'g, Baldwin v. State,* 45 Md. App. 378 (1980), the provision in the orders was inadequate. We read the opinion to the contrary.

In *Baldwin,* a wiretap order contained the same provision ordering progress reports as was contained in the orders in the instant case. As here, the issuing judge did not set forth in his order a schedule by which the police were to make the reports; however, in *Baldwin,* the issuing judge *never* gave the police *any* instructions for reporting. The fact that the police actually filed weekly progress reports with the judge, we held, did not cure the violation of § 10-408 (f). The Court of Appeals agreed. Significantly, however, Chief Judge Murphy tempered our holding by saying:

"We do not agree, however, with the Court of Special Appeals that § 10-408 (f) requires that the order itself incorporate a schedule of the reporting intervals required by the issuing judge. No such requirement is contained in § 10-408 (f). We think the statutory directive that the reports be made 'at the intervals the judge requires' is met where the issuing judge orders the making of reports at designated intervals, the first of which must be scheduled at the time the wiretap authorization is initially given." 289 Md. at 644.

And although it was noted that written instructions independent of an *ex parte* order constituted the "preferable method of compliance" with § 10-408 (f) so as to reduce the likelihood that police would misunderstand the wiretap instructions, Chief Judge Murphy held:

"The statute does not specify whether the required reports must be in writing or may be verbal, nor does it indicate that the judge's designation of the reporting intervals need be in writing or may be orally imported to the monitoring agents." **289 Md.** at 644.

In the instant case in both Baltimore and Carroll Counties, the issuing judges gave oral instructions to the police requiring periodic progress reports. At the pre-trial hearings before Judge Alpert the following testimony revealed Judge Cicone's instructions to the police were adequate.

"Q. You testified with regard to Judge Cicone's involvement and as to his being advised as to the progress of the investigation, when was this procedure with regard to reporting it to the Court established?

A. We were, do you want the exact date. I have a memo dated February 27, 1978, which stated February 24 [N.B., the date that the Baltimore County wiretap was first issued], Detective Corporal Hunt, Detective Leonard and Assistant State's Attorney Ruppersberger went to Judge Cicone's chambers. That was in regard to minimization, but also during that time they had the authorization for the wiretap. I mean, the minimization and *at this time Judge Cicone orally advised to Detective Corporal Hunt that verbal notification to be, would be every four days,* and Judge Cicone advised Detective Hunt if this wasn't possible for some reason, say we could not contact him, then after that four-day interval this was done on February 24, 1978.

Q. Was in fact the reporting done at four-day intervals without exception during the existence of the tapping?

A. I believe I can give all the dates. I believe it was done less than four-day intervals for the most part. [Emphasis added.]"

Similarly, Judge Weant's reporting instructions were attested to:

"Q. Corporal Settle, did you give any instructions to the officers that were working for you as far as any communications they should make to Judge Weant, who was the judge who authorized this interception, regarding the progress of the interception?

A. I told the people who were working the plant, and *on Judge Weant's directions, that I would contact Judge Weant once a week.* I contacted Judge Weant every Monday after the issuance of the ex parte order. I got together with all the guys, ascertained the information, then I reported to Judge Weant what had transpired. [Emphasis added]."

It is clear that instructions, for reporting at designated intervals were given to the police monitors in both counties and that these instructions were understood and obeyed by the monitoring agents.

### E. Sealing of the Wiretap Orders

Appellants' final complaint regarding the wiretap procedure followed is that the original orders authorizing wiretaps failed to comply with § 10-408 (g) (2), which provides:

"Applications made and orders granted under this subtitle shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. . . ."

In both Carroll and Baltimore Counties, the issuing judges directed the State's Attorneys' Offices to keep the original of the wiretap applications and orders as their authority to tap while true test copies thereof were immediately placed under seal and filed with the court clerks. Subsequently the original documents were placed under seal.

Although no cases on this issue have been offered for our guidance, we fail to see how this procedure violated the dictates of § 10-408 (g) (2). While there was some delay in sealing the original documents, § 10-408 (g) (2) does not require that this be done immediately upon issuance. *Contrast,* § 10-408 (g) (1), which explicitly requires that the recordings of contents of intercepted communication be made available to the issuing judge for sealing "immediately" upon the expiration of the wiretap period. Of crucial importance, we think, is that the procedure employed was consistent with the basic purpose of the statute, i.e., the preservation of authenticity and confidentiality. *See,* 1968 U.S. Code Cong. & Admin. News 2112, 2194. There was no violation.

## II. Double Jeopardy

Appellants Jeffrey Blinken and Bruce Salzman each make several arguments challenging their convictions on double jeopardy grounds. For ease of reference, their convictions are set forth as follows:

<u>Convictions</u>                    <u>Sentences</u>

<u>Bruce Salzman</u>

| Convictions | Sentences |
|---|---|
| 1. possession of marijuana with intent to distribute | 5 years, $15,000 fine |
| 2. possession of marijuana | 1 year, $1,000 fine (concurrent with #1) |
| 3. maintaining a common nuisance-residence | 5 years, $15,000 fine (consecutive to #1 and #2) |

48

| Convictions | Sentences |
|---|---|
| 4. maintaining a common nuisance-GMC wagon | 5 years, $15,000 fine (concurrent to #3, but consecutive to #1 and #2) |
| 5. maintaining a common nuisance-Mercedes Benz | 5 years, $15,000 fine (consecutive to #3, #4 and #6) |
| 6. possession of cocaine | 1 year (consecutive to #3 and #4) |

| Convictions | Sentences |
|---|---|

### Jeffrey Blinken

| | |
|---|---|
| 1. possession of marijuana with intent to distribute | 5 years |
| 2. possession of marijuana | 1 year (concurrent to #1) |
| 3. possession of cocaine with intent to distribute | 20 years (consecutive to #1) |
| 4. possession of cocaine | 4 years (concurrent to #1 and #3) |
| 5. possession of methaqualone | 4 years (concurrent to #1 and #3) |
| 6. maintaining a common nuisance-cocaine | 20 years (concurrent to #1 and #3) |
| 7. maintaining a common nuisance-marijuana | 5 years (concurrent to #1 and #3) |

### A. Possession of Controlled Dangerous Substances and Possession of Controlled Dangerous Substances with Intent to Distribute

Appellants assert that under the required evidence test (*see, e.g., Lewis v. State,* 285 Md. 706, 722-23 (1979); *Brooks v. State,* 284 Md. 416, 419-20 (1979); *Thomas v. State,* 277

Md. 257, 267 (1976)), their convictions for simple possession of controlled dangerous substances should merge into their convictions for possession of controlled dangerous substances with intent to distribute.

It would seem, however, that these convictions have already been merged on behalf of Jeffrey Blinken. On July 16, 1980, pursuant to Md. Ann. Code Art. 27, §§ 645 JA-645 JE, an order appointing a three-judge panel to review the sentences of Blinken was passed. Although it is not reflected in the record transmitted to us, we are informed by the State's brief that the panel modified Blinken's sentence on #3 above by making it concurrent, rather than consecutive, and further considered his offenses #2 and #4 (simple possession of marijuana and cocaine) to have merged into #1 and #3 (possession with intent to distribute marijuana and cocaine) respectively. If that be the case, Jeffrey Blinken's argument on appeal, that his convictions for simple possession of marijuana and cocaine should merge into his convictions for possession with intent to distribute the same, is clearly moot.

Even if the review panel had not so decided, from the record in appellant Jeffrey Blinken's trial, it is clear that defense counsel, after raising the issue of merger, acquiesced in the trial judge's response that he would obviate that issue by sentencing appellant to concurrent terms on his possession and possession with intent to distribute counts:

"COURT: Gentlemen, do you feel that any of these counts, before 1 get to sentencing, should merge.

MR. SUTLEY [DEFENSE COUNSEL]: Your Honor, I think the second merges with the first, and the fourth merges with the third. I don't think there's any question about that. I don't believe the other ones do.

MR. HICKMAN [PROSECUTOR]: I think perhaps the second and the first may run concurrently, Your Honor, not necessarily merged, as well as the fourth and third.

> THE COURT: It really makes no difference, does it really, from a sentencing standpoint if we're talking about merger or concurrence.
>
> MR. HICKMAN: Correct."

Because appellant made no response to the judge's question nor indicated any objection to the concurrent sentences imposed, the issue was not properly preserved for appeal, Md. Rule 1085. As such, even if the issue were not moot, we would still decline to consider it since appellant received concurrent sentences on his simple possession and possession with intent to distribute counts. *Rose v. State,* 37 Md. App. 388, 393-94, *cert. denied,* 281 Md. 743 (1977).

Appellant Salzman similarly argues that his conviction for simple possession of marijuana should merge with his conviction for possession of marijuana with intent to distribute. Although Salzman argued this point when urging the court to grant his motion for judgment of acquittal, the doctrine of merger is not properly invoked at that stage when the court first considers the legal sufficiency of the evidence and when no verdicts have yet been rendered. *See, Goldberg v. State,* 41 Md. App. 58, 70-71 n.4; *see, also, Cross v. State,* 36 Md. App. 502, 511-12 (1977), *rev'd on other grounds,* 282 Md. 468 (1978). Upon receiving verdicts of guilty on both counts thereafter, appellant did not raise the issue of merger and thus did not preserve it for appeal. Md. Rule 1085, *Von Lusch, supra.* Because appellant was sentenced to concurrent terms on these counts, we will likewise decline to address this issue. *Rose v. State, supra.*

### B. Possession with Intent to Distribute and Maintenance of Common Nuisance

Appellants Jeffrey Blinken and Bruce Salzman secondly assert that their convictions for possession of controlled dangerous substances with intent to distribute and for maintaining common nuisances should merge. Because Blinken did not preserve this issue by objecting to his

sentences below and because he received concurrent sentences on his possession with intent to distribute and maintenance of a common nuisance counts, we will not address his contention. Md. Rule 1085; *Rose v. State, supra.* Although Salzman only raised the issue upon his motion for judgment of acquittal but did not object after conviction, *see, Goldberg, supra, Cross, supra,* we will address his contention since he received consecutive sentences for possession of marijuana with intent to distribute and maintaining a residence as a common nuisance for the purpose of keeping or selling illegal drugs. *Rose v. State, supra* at 393.

Where a defendant is charged with two separate statutory offenses, the test as to whether they should merge is simply whether conviction under each statutory provision requires proof of a fact which the other does not, i.e., the required evidence test. *Brooks v. State, supra* at 419; *Thomas v. State, supra* at 267. The charge of possession with intent to distribute under Md. Ann. Code Art. 27, § 286 (a) (1), requires proof that the accused possessed a controlled dangerous substance in sufficient quantity to indicate reasonably under all the circumstances an intent to manufacture, distribute or dispense. *See, State v. Beers,* 21 Md. App. 39, 41 (1974). Conviction for maintaining a common nuisance under Md. Ann. Code Art. 27, § 286 (a) (5), however, requires proof that the accused keeps and maintains a place in a continuing and recurring fashion for illegally administering controlled dangerous substances or for the illegal manufacturing, distribution, dispensing, storage or concealment of controlled dangerous substances or controlled paraphernalia. *See, e.g., Skinner v. State,* 16 Md. App. 116, 124-25, 129, *cert. denied,* 267 Md. 744 (1972), *Nutt v. State,* 16 Md. App. 695, 708, *cert. denied,* 269 Md. 764 (1973).

It is clear that each offense requires proof of at least one fact that the other does not. Section 286 (a) (1) requires possession of the controlled dangerous substance itself, but § 286 (a) (5) does not. Conversely, § 286 (a) (5) requires the maintenance of a place in a continuing and recurring fashion for the illegal distribution, storing, manufacturing,

etc. of controlled dangerous substances, while § 286 (a) (1) requires no such element. The fact that possession of controlled dangerous substances will often coincide with the maintaining of a place for distributing, dispensing, storing or selling the same, does not render the offenses identical for double jeopardy purposes. Salzman's convictions under §§ 286 (a) (1) and 286 (a) (5) do not merge.

### C. Maintaining a Common Nuisance (Residence) and Maintaining a Common Nuisance (Unlicensed Mercedes Benz)

Appellant Salzman's final double jeopardy complaint concerns his convictions for maintaining two separate common nuisances — one being his residence and the other an unlicensed Mercedes Benz parked near his house. On April 28, 1978, members of the Maryland State Police executed a search and seizure warrant at the Frederick County residence of Salzman. They seized various illegal drugs found in the residence and Salzman's GMC wagon, which had also been mentioned in the warrant. Also searched, though not mentioned in the warrant, was an unlicensed Mercedes Benz automobile parked some thirty yards from the GMC truck. From the trunk of the Mercedes the troopers seized approximately seven pounds of marijuana, a revolver, three quaalude tablets, one bag of cocaine, and $598,000 in cash.

At the pre-trial hearings on the motions to suppress, appellant challenged the search of the Mercedes as being outside the scope of the search, but Judge Alpert ruled that the car was within the curtilage of the house, and therefore within the scope of the search warrant. Salzman was subsequently charged separately under Article 27, § 286 (a) (5) for three common nuisance violations (one for his house, the second for the GMC vehicle and the third for the Mercedes), convicted on all three, and given separate sentences for each offense. On appeal he contends that if the Mercedes could be deemed part of the curtilage for purposes of the search, it could not then be detached from the land and

found to be a separately maintained common nuisance in and of itself.

The determination of what lies within the scope of the curtilage for search and seizure purposes is based upon an inquiry as to whether the defendant has a reasonably "legitimate expectation of privacy" with regard to the area or place searched. *See, Everhart v. State,* 274 Md. 459, 484-86 (1975). Judge Alpert's finding that appellant held such an expectation of privacy with regard to the unlicensed Mercedes, however, was in no way determinative of the number of common nuisance counts for which appellant could be found guilty.

The criminal statute defining and prohibiting the maintenance of common nuisances clearly provides that it shall be unlawful

> "To keep or maintain any common nuisance which shall mean *any dwelling house,* apartment, building, *vehicle,* vessel, aircraft, *or any place whatever* which is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances or which is used for the illegal manufacture, distribution, dispensing, storage, or concealment of controlled dangerous substances or controlled paraphernalia, as defined. . . ." Article 27, § 286 (a) (5).

Here the trial court found the evidence sufficient to conclude that Salzman was maintaining not one but three separate common nuisances. There is nothing in the statute or case law which required the court to merge its finding of nuisance with regard to maintenance of the Mercedes into the finding of residential nuisance merely because of the proximity of automobile to residence or because the car was within the curtilage for search and seizure purposes. We find no double jeopardy violation.

## III. Sufficiency of the Evidence

### A. Paul Blinken — Conspiracy to Distribute Cocaine

To prove conspiracy, the State must show that "at least two persons had a meeting of the minds — a unity of design and purpose — to accomplish a criminal or unlawful act, or to do a lawful act by criminal or unlawful means." *Terrell v. State,* 34 Md. App. 418, 422-23 (1977); *Wilson v. State,* 8 Md. App. 653, 671, *cert. denied,* 258 Md. 731 (1970). The gist of conspiracy being the unlawful combination, no further overt act is needed to prove it. *Wilson, supra* at 671.

The evidence presented by the State to prove that Paul Blinken "conspired to distribute cocaine consisted of (1) three intercepted telephone conversations between appellant and Jeffrey Blinken and one Larry Solomon from which an expert in narcotics investigation testified it could be inferred that Paul Blinken was going to supply Jeffrey Blinken and Solomon with cocaine so that these individuals could sell it to others, and (2) a stipulation that two grams, 700 milligrams of cocaine, 95% to 100% pure was seized from Paul Blinken's home.

Although the State conceded that the amount of cocaine seized from Paul Blinken's residence would be insufficient in and of itself to support an inference of possession with intent to distribute, *see, United States v. Mather,* 465 F.2d 1035 (5th Cir.), *cert. denied,* 93 S. Ct. 685 (1972), the three phone conversations, as interpreted by the expert witness, did support a reasonable inference that appellant combined with others for an illegal purpose. That being sufficient to prove conspiracy, *see, Terrell, supra, Wilson, supra,* we must affirm for we have but recently been reminded that, as a reviewing court, we are not to ask whether *we* believe the evidence established guilt beyond a reasonable doubt (though here we do), but rather our inquiry is limited to

" 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt. [Citation omitted.]' " *State v. Rusk,* 289 Md. 230.

### B. Jeffrey Blinken — Possession of Cocaine with Intent to Distribute

Appellant Jeffrey Blinken contends that there was insufficient evidence to support his conviction for possession of cocaine with intent to distribute. Specifically, he argues that while proof of simple possession may have existed, there was no evidence from which to infer an intent to distribute cocaine.

Presented at trial by way of an agreed statement of facts, the evidence against appellant included: (1) that two ounces of cocaine, having a street value of $4,000 was seized from appellant's home; (2) that quantities of marijuana and methaqualone were also seized therefrom; (3) that appellant had had telephone conversations with Paul Blinken regarding purchasing and reselling cocaine; and (4) that appellant had had numerous telephone conversations with several people regarding his acquisition, distribution and selling of marijuana.

Intent to distribute controlled dangerous substances is "seldom proved directly, but is more often found by drawing inferences from facts proved which reasonably indicate under all the circumstances the existence of the required intent." *Waller v. State,* 13 Md. App. 615, 618, *cert. denied,* 264 Md. 752 (1972). And the very quantity of narcotics in possession may indicate an intent to distribute, *State v. Beers, supra.* In *United States v. Mather, supra,* evidence that the accused possessed 197.75 grams of cocaine with a judicially noted "high value . . . of $2,500" when delivered, was held sufficient, without more, to make out a prima facie case of intent to distribute cocaine. There the Fifth Circuit cited the supervisory rule from *United States v. Gonzalez,* 442 F.2d 698 (2d Cir. 1971), an illegal drug importation case, as instructive as to what amount of cocaine is likely to be small or personal to the possessor, rather than possessed for commercial purposes. The *Gonzalez* court had ruled that a

presumption of illegal importation from the possession of large quantities of cocaine, "is not limit[ed] . . . to quantities exceeding one kilogram." *Id.* at 1037. But the court set a minimum limit for the presumption to arise:

"courts would be well-advised to refrain from charging the statutory presumption when the quantity is of the order of ten grams or less." *Id.*

In the instant case we judicially note that Jeffrey Blinken's possession of two ounces of cocaine is equivalent to 56.7 grams of cocaine. While this is less in sheer quantity than the amount seized in *Mather,* its street value is much higher than that of the heavily diluted cocaine in *Mather.* More importantly, the amount seized is well over the ten-gram limit set forth in *Gonzalez* as the maximum amount of cocaine indicative of personal use. We find the evidence of the amount of cocaine seized from appellant along with his telephone conversations concerning his distribution of drugs, when taken in the light most favorable to the State (*Rusk, supra*), to be sufficient to support appellant's conviction for possession of cocaine with intent to distribute. The conviction was not clearly erroneous. Md. Rule 1086.

## C. Jeffrey Blinken — Maintaining a Common Nuisance — Cocaine

Appellant Jeffrey Blinken further contends that his conviction for maintaining a common nuisance — cocaine must be reversed because there was no evidence that he used his residence for the illegal distribution, storage, or concealment of drugs for persons other than himself. We find, however, that taking the evidence in the light most favorable to the State (*Rusk, supra*), the quantity of cocaine seized from appellant's home coupled with his incriminating telephone conversations regarding selling the drug, constituted sufficient evidence from which the factfinder could reasonably conclude that appellant maintained his house as a place of business for selling and storing cocaine

on a continuing and recurring basis. *See, Hunt v. State,* 20 Md. App. 164, 169, *cert. denied,* 271 Md. 738 (1974). The judgment is thus affirmed.

### IV. Waiver of Right to Trial by Jury

Finally, three appellants, Paul Blinken, Jeffrey Blinken, and Bruce Salzman, contend that their elections of court trials were made without full knowledge and understanding of the nature of a jury trial. Maryland Rule 735 d, which sets forth the requirement that a defendant's waiver of trial by jury must be "knowingly and voluntarily" made, was explained by the Court of Appeals in *Countess v. State,* 286 Md. 444, 455 (1979):

> "What the Rule contemplates is that the defendant have a basic understanding of the nature of a jury trial. We think that this understanding is *generally satisfied* when the defendant entitled to a jury trial knows that he has the right to be tried by a jury of 12 persons or by the court without a jury; that whether trial is by a jury or by the court, his guilt must be found to be beyond a reasonable doubt; that in a jury trial all 12 jurors must agree that he is so guilty but in a court trial the judge may so find. [Emphasis added]."

We find that the requirements of Md. Rule 735 d, as explained by *Countess,* were "generally satisfied" in all three appellants' cases.

### A. Paul Blinken

Appellant Paul Blinken was tried in the Circuit Court for Carroll County along with his co-defendants Marcia Blinken and Bruce Salzman. All three defendants, charged in one indictment with the same three counts, waived the right to trial by jury after being extensively advised as to the nature of a jury trial. Before effecting his waiver, Paul Blinken was informed that he had a right to trial by a jury of twelve

persons and that, whether tried by the court or a jury, his guilt would have to be established beyond a reasonable doubt. He complains, however, that his waiver was defective because counsel failed to inquire whether Blinken understood that a jury's verdict would have to be unanimous.

A review of the record indicates that appellant was clearly aware of the unanimity requirement. Only minutes before his own waiver of trial by jury, Paul Blinken observed his co-defendant Salzman's waiver. Salzman had been advised (1) that he was entitled to be tried by a jury of twelve persons, (2) that whether tried by court or jury, he would have to be found guilty beyond a reasonable doubt, and (3) that if tried by jury, the jury's verdict would have to be unanimous. Then again, only minutes after his own waiver, Paul Blinken observed his wife being advised of the same aspects, including the fact that a jury's verdict would have to be unanimous. The unanimity requirement was thus explicated, not once, but twice in appellant's presence. From this we are "satisfied" that Paul Blinken understood the nature of a jury trial, including the knowledge that a jury's verdict must be unanimous. That is all that *Countess* requires. Since they complain of not knowing that *the State's* burden was so strict as it is, to conclude otherwise would be to blink at substance and hollow form at the expense of society. While we are admonished to follow rules "believed to be unnecessary or inadvisable" while seeking change through traditional routes, *Ricketts v. State,* 290 Md. 287 (1981), we are not compelled to extend them to further absurdity.

## B. Jeffrey Blinken and Bruce Salzman

Appellants Jeffrey Blinken and Bruce Salzman were tried separately in the Circuit Courts for Carroll and Frederick Counties, respectively.[7] Prior to taking his waiver of trial by jury, the court explained to Jeffrey Blinken (1) that he had

---

**7.** Bruce Salzman was also tried and convicted in Carroll County, but he raises no Md. Rule 735 d issue with regard to that trial.

a right to be tried by a jury of twelve persons, (2) that a jury's verdict would have to be unanimous, and (3) that a jury would have to find guilt beyond a reasonable doubt. In the Circuit Court for Frederick County, Bruce Salzman was advised of the same three features. Both appellants complain, however, that based upon a hyper-technical reading of *Countess,* they should have been advised that the standard of proof of guilt beyond a reasonable doubt would likewise apply when tried by the court.

We fail to comprehend the rationale for appellants' complaint. Unlike *Ricketts v. State,* 46 Md. App. 410, 414 (1980), *aff'd,* 290 Md. 287 (1981), where the defendant had not been advised at all that his guilt would have to be established beyond a reasonable doubt, both appellants were advised of all the salient features of trial by jury, including the fact that a jury would have to find them guilty beyond a reasonable doubt. Neither was misled in the slightest to believe that there would be a different standard of proof applicable in a trial by the court. In sum, appellants had a "basic understanding of the nature of a jury trial," as required by Md. Rule 735 d, *Countess v. State, supra* at 455, even if their attorneys had failed to apprise them when advising upon the election. The waivers are therefore valid.

*Judgments affirmed.*
*Costs to be paid by appellants.*