911 A.2d 867

James Davis PURNELL

v.

STATE of Maryland.

No. 210, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Dec. 4, 2006.

584

Stacy W. McCormack (Nancy S. Forster, Public Defender, on brief), for appellant.

Brian S. Kleinbord (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DAVIS, DEBORAH S. EYLER, WOODWARD, JJ.

DAVIS, J.

Appellant, James Davis Purnell, was tried and convicted in the Circuit Court for Baltimore County at a bench trial (Ballou–Watts, J.) for possession with intent to distribute cocaine and possession of marijuana. He was thereafter sentenced as a subsequent offender to a term of ten years imprisonment, without the possibility of parole, for possession with intent to distribute cocaine and to a concurrent sentence of one year imprisonment for possession of marijuana. From these convictions and sentences, appellant files this timely appeal, presenting the following issues for our review:

I. Whether the trial court erred in denying appellant's motion to suppress; and

II. Whether the evidence was sufficient to sustain appellant's conviction for possession with intent to distribute cocaine.

## FACTUAL AND PROCEDURAL BACKGROUND

At the hearing on appellant's Motion to Suppress, the following testimony was elicited. On December 2, 2003, Police

Officer Jeffrey Peach, assigned to the Baltimore County K–9 unit, was sitting in marked Unit No. 1112 on Dartford Road in Baltimore County and, at approximately 2:45 p.m., observed a gold Honda Accord traveling down Dartford Road. The vehicle did not have a front license plate affixed to the front grill, but rather it was placed on the dash board within the vehicle. After following the car for three to five minutes, Officer Peach stopped the vehicle for the traffic violation.

Appellant, James D. Purnell, was the passenger in the front seat of the gold Honda driven by Lakisha Conyers. Officer Peach approached the vehicle and first met with the driver and advised her of the reason for the stop. Afterwards, Officer Peach requested her driver's license and registration. Although the driver failed to produce identification, she provided her name and date of birth. The officer also spoke to appellant and requested his driver's license. Appellant retrieved his license from the pocket of a black coat that was on the rear seat behind him. The coat was within the reach of both the driver and the passenger. The officer returned to his police cruiser and had the dispatcher "run a routine driver's license check of the driver." The routine check revealed that Conyers' license "was currently suspended." Based upon the information retrieved and the driver's failure to produce her identification, she was arrested and ordered into the police cruiser. Upon securing the driver, the police officer returned to the Honda and asked appellant to exit the vehicle to allow him to conduct a search of the vehicle incident to an arrest. Appellant was then instructed to exit the vehicle. He sat down on the grassy area approximately fifteen feet from the Honda Accord.

The officer searched the front and rear of the car, including the coat that appellant previously "retrieved his driver's license from." The officer discovered, inside the opposite pocket from where appellant retrieved his license, a "small recyclable grocery bag" that was "tied in a knot." Inside the bag, Officer Peach found twelve individualized yellow baggies containing crack cocaine and three baggies of marijuana. Appel-

lant was then placed under arrest, advised of his *Miranda*[1] rights, and transported to the police precinct. While at the police precinct, appellant made a statement acknowledging ownership of the drugs.

On December 13, 2004, alleging a violation of his Fourth Amendment rights under the United States Constitution, appellant moved to suppress evidence obtained by the police officer during the search of his coat and his statement made subsequent to the search. At the conclusion of the hearing on the motion to suppress, the circuit court issued its ruling, denying appellant's motion:

The State argues that this search was based on a search incident to arrest of the female driver who was properly arrested because she was driving on a suspended license. The defense does not see that as the appropriate exception, particularly in light of Officer Peach's acknowledgment that he knew that the jacket that was searched belonged to this defendant.

The court finds, in looking at the totality of circumstances, first of all, I find that the arrest of the female passenger was a proper arrest, and therefore, the police had the authority, they had a right to search incident to arrest the passenger compartment of the Honda Accord. And this includes the black, puffy jacket that has been referred to.

There was testimony that during Mister or Officer Peach's direct that the jacket could be retrieved by either the passenger or the driver reaching back simply to access it on the back seat. And while I am concerned about the fact that the driver was secured in the police cruiser at the time that the search was conducted, I think the case law is very clear that the police were entitled to conduct that search. And that search would include a search of the black jacket that has been mentioned several times.

And so the court finds that the search was valid.

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Immediately following the court's ruling on the motion to suppress, appellant waived his right to a jury trial and agreed to proceed by way of a court trial. Appellant and the State stipulated to the officer's suppression hearing testimony incorporated into the record and agreed to limit the scope of evidence to expert testimony on the issue of intent to distribute. Defense counsel stated:

> There is no issue as to the facts, Your Honor. The only question that exists is whether the defendant's possession was simple position [sic] or with intent. So I have no problem if we can agree on a statement of facts as to the entire case, except the one issue as to his intent and the possession. Detective Massoni can testify on that point, and the defendant can testify on that point and everything else is conceded or we can try it from scratch, either way.

The prosecutor replied:

> Your Honor, if your honor would be inclined to allow us to proceed in the following way: [w]e would have Officer Peach's testimony from the motions incorporated into this trial, with a very brief addition to that. We'd submit a copy of the analysis, as well as the drugs themselves as State's [Exhibits 1 and 2].... And then the State would call Detective Frank Massoni, who is not a factual witness, but purely in an expertise situation, to testify about possession with intent, obviously with cross-examination by counsel.

Detective Frank Massoni of Baltimore County's Community Drug and Violence Interdiction Team (CDVIT) unit was called by the State as an expert in the area of packaging, distribution and recognition of cocaine.

The circuit court rejected appellant's testimony in which he had explained that he bought drugs from "Pooky" and that the drugs were strictly for his personal use. The court further stated that it "did not find the [appellant's] testimony credible" and it was "satisfied [that] the State has met its burden beyond a reasonable doubt and I find the defendant guilty."

After rejecting appellant's explanation as to how the drugs came to be in his possession, the Circuit Court for Baltimore County issued its ruling:

[T]he Court finds that the testimony of Detective Massoni was very helpful in evaluating the evidence in this case. The defendant had twelve bags of cocaine. They were packaged in a manner that is consistent with distribution. It is true that nothing was found in the vehicle, in the Honda Accord, such as some type of sheet, no scales were found, no other indicia of drug distribution, but then the vehicle did not belong to the defendant. The defendant was catching a ride with this young lady who was a friend of his. I don't know that I would necessarily expect those types of things to be found in a vehicle.

Nothing was found that would be consistent with him simply being a user of crack cocaine. The twelve bags of crack cocaine were contained in individual twenty dollar bags, and those bags were contained in another bag. In addition, as was pointed out during the State's case, if the defendant were truly a user, it would have made more sense for him to buy an eighth of an ounce at a lesser amount.

## STANDARD OF REVIEW

The standard which we must apply in our review of a challenge to the denial of a motion to suppress has been summarized by the Court of Appeals in *State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660 (2002):

Our review of a Circuit Court's denial of a motion to suppress evidence under the Fourth Amendment is limited, ordinarily, to information contained in the record of the suppression hearing and not the record of the trial. *See Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999); *In re Tariq A–R–Y*, 347 Md. 484, 488, 701 A.2d 691 (1997); *Simpler v. State*, 318 Md. 311, 312, 568 A.2d 22, (1990); *Trusty v. State*, 308 Md. 658, 670, 521 A.2d 749 (1987). When there is a denial of a motion to suppress, we are further limited to considering facts in the light most favor-

able to the State as the prevailing party on the motion. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990); *Simpler*, 318 Md. at 312, 568 A.2d 22. In considering the evidence presented at the suppression hearing, we extend great deference to the fact-finding of the suppression hearing judge with respect to the weighing and determining first-level facts. *Lancaster v. State*, 86 Md.App. 74, 95, 585 A.2d 274 (1991); *Perkins v. State*, 83 Md.App. 341, 346, 574 A.2d 356 (1990).... Even so, as to the ultimate conclusion of whether an action taken was proper, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case. *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Munafo v. State*, 105 Md.App. 662, 669, 660 A.2d 1068 (1995).

## LEGAL ANALYSIS

### I

■ Appellant, in his first assignment of error, posits in his brief:

In this case, [appellant] was a passenger in a car that was stopped for a minor traffic violation. Ms. Conyers was arrested for driving on a suspended license, a crime that only one person can commit. It was only after Ms. Conyers was arrested and placed in the back of a police cruiser that [appellant] was ordered out of the car and a search of the passenger compartment was conducted. During that search, Officer Peach picked up the coat, which he knew belonged to [appellant], a person who was not under arrest nor was suspected of being involved in any criminal wrongdoing, and opened up every pocket in order to examine its contents.

Such a search clearly falls outside the scope of *Belton*. The search in this case was not required for the purpose of officer safety, nor was it necessary to prevent evidence of the crime from being destroyed. *See [N.Y. v.] Belton*, [453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), *Chimel [v. CA]*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)].

The only crime committed in this case was committed by Ms. Conyers when she drove on a suspended license and there was certainly no evidence in [appellant's] coat pocket regarding that crime.

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Judge Cathell, writing for the Court of Appeals, in the recent decision in *Byndloss v. State,* 391 Md. 462, 479–81, 893 A.2d 1119 (2006), discussed the yardstick by which we measure whether the stopping of a motor vehicle violates Fourth Amendment strictures:

The Fourth Amendment protects against *unreasonable* searches and seizures. *See Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996); *United States v. Mendenhall,* 446 U.S. 544, 550–51, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497, *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980). It is evident that the stopping of a vehicle and the detention of its occupants is a seizure and thus implicates the Fourth Amendment. *See Whren,* 517 U.S. at 809–10, 116 S.Ct. at 1772, 135 L.Ed.2d 89; *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren,* 517 U.S. at 810, 116 S.Ct. at 1772, 135 L.Ed.2d 89 (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (*per curiam* )). How-

ever, the detention of a person "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion).

We stated in *Wilkes v. State,* 364 Md. 554, 774 A.2d 420 (2001):

In determining whether there has been a violation of the Fourth Amendment right against unreasonable searches and seizures, the Supreme Court has stated:

The touchstone of our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

*Pennsylvania v. Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *see also Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996); *Stokes [v. State ],* 362 Md. [407,] 412–13 n. 7, 765 A.2d [612,] 615 n. 7 [ (2001) ].

 There are certain basic premises upon which the Fourth Amendment analysis is grounded. In determining whether there has been a violation of the Fourth Amendment right against unreasonable searches and seizures, the touchstone of our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Wilkes, supra; Terry, supra.* Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brignoni–Ponce,* 422 U.S. at 878, 95 S.Ct. 2574; *Mimms,* 434 U.S. at 108–09, 98 S.Ct. 330; *see also Robinette,* 519 U.S. at 39, 117 S.Ct. 417; *Stokes,* 362

Md. at 412–13 n. 7, 765 A.2d 612; *Wilkes,* 364 Md. at 571, 774 A.2d 420.

In *Belton,* 453 U.S. at 455–56, 101 S.Ct. 2860, the Supreme Court granted *certiorari* to consider whether the recovery of cocaine from the pocket of a leather jacket belonging to an occupant of a vehicle which had been stopped for traveling at an excessive rate of speed on the New York Thruway comported with Fourth Amendment strictures. It was discovered that none of the four occupants owned the vehicle or was related to its owner when the driver was asked for his license and registration. Because the policeman had smelled burnt marijuana and had seen on the floor of the car an envelope marked "Supergold," which he associated with marijuana, he directed the men to get out the car and placed them under arrest for the unlawful possession of marijuana. The officer then picked up the envelope marked "Supergold" and found that it contained marijuana, after which he gave the four men the warnings required by *Miranda, supra,* he then searched each one of them. Significantly, the jacket had been on the back seat of the vehicle at a time when the four men had been placed under arrest and ordered out of the car.

The Supreme Court held that

(1) when a policeman has made a lawful custodial arrest of the occupant[s] of an automobile, he may, as a contemporaneous incident of that arrest, *search the passenger compartment of the vehicle and may also examine the contents of any container found within the passenger compartment and such "container", i.e., an object capable of holding another object, may be searched whether it is open or closed,* and (2) *where defendant, an automobile occupant,* was subject of lawful custodial arrest on charge of possessing marijuana, search of defendant's jacket, which was found inside passenger compartment immediately following arrest, was incident to lawful custodial arrest, notwithstanding that officer unzipped pockets and discovered cocaine.

*Id.* at 460, 86 S.Ct. 1602 (emphasis added).

Appellant, in an attempt to distinguish *Belton* from the case, *sub judice,* posits the following:

In *Belton*, all of the occupants of an automobile were arrested after the car they were driving in was stopped for a traffic violation. 453 U.S. at 455, 101 S.Ct. 2860. During the stop, the officer discovered that none of the occupants owned the vehicle or were related to the owner. *Id.* More importantly, the officer smelled burnt marijuana and saw an envelope containing what he believed to be marijuana on the floor of the car. *Id.* at 455–56, 101 S.Ct. 2860. All of the occupants were then ordered out of the car and arrested for possession of marijuana. *Id.* It was only then that a search of a passenger compartment of the car was conducted. *Id.* During that search, the officer found cocaine inside the pocket of a jacket that belonged to Belton.

Appellant further argues that *Belton* may be distinguished because the *Belton* decision addresses "an occupant of an automobile."

In *Thornton v. U.S.*, 541 U.S. 615, 617–18, 124 S.Ct. 2127, 2129, 158 L.Ed.2d 905 (2004), the Supreme Court granted *certiorari* to determine whether *Belton*'s rule is limited to situations where the officer makes contact with the occupant while the occupant is inside the vehicle or whether it applies as well when the officer first makes contact with the arrestee after the latter has stepped out of his vehicle. In deciding the question, the Court concluded that *Belton* governs even when an officer does not make contact until the person arrested has left the vehicle.

Petitioner Marcus Thornton was first noticed by Officer Deion Nichols of the Norfolk, Virginia, Police Department, who was in uniform but driving an unmarked police car, when he slowed down so as to avoid driving next to the officer. After discovering from a computer check of petitioner's license tags, which revealed that the tags had been issued to a 1982 Chevy two-door and not to a Lincoln Towne Car, the model of car petitioner was driving, Thornton drove into a parking lot, parked, and got out of the vehicle before the officer had an opportunity to pull him over. The officer pulled in behind him, parked the patrol car and accosted Thornton, asking him

for his driver's license. He also told him that his license tags did not match the vehicle that he was driving. Upon questioning by the officer, Thornton admitted that he had drugs on him and reached into his pocket and pulled out two individual bags, one containing three bags of marihuana and the other containing a large amount of crack cocaine. Also recovered from under the driver's seat was a BryCo 9–millimeter handgun. *Id.* at 617–18, 124 S.Ct. at 2129.

The Court ultimately held:

> In all relevant aspects, the arrest of a suspect *who is next to a vehicle* presents identical concerns regarding officer safety and the destruction of evidence as the arrest of one who is inside the vehicle. An officer may search a suspect's vehicle under *Belton only if the suspect is arrested. See Knowles [v. Iowa,* 525 U.S. 113,] 117–18, 119 S.Ct. 484, 142 L.Ed.2d 492. A custodial arrest is fluid and "[t]he danger to the police officer flows from *the fact of the arrest,* and its attendant proximity, stress, and uncertainty," [*U.S. v. Robinson,* 414 U.S. 218, 234–235 n. 5, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)] (emphasis added). *See Washington v. Chrisman,* 455 U.S. 1, 7, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982) ("Every arrest must be presumed to present a risk of danger to the arresting officer"). *The stress is no less merely because the arrestee exited his car before the officer initiated contact, nor is an arrestee less likely to attempt to lunge for a weapon or to destroy evidence if he is outside of, but still in control of, the vehicle. In either case, the officer faces a highly volatile situation.* It would make little sense to apply two different rules to what is, at bottom, the same situation.
>
> In some circumstances it may be safer and more effective for officers to conceal their presence from a suspect until he has left his vehicle. Certainly that is a judgment officers should be free to make. But under the strictures of petitioner's proposed "contact initiation" rule, officers who do so would be unable to search the car's passenger compartment in the event of a custodial arrest, potentially compromising their safety and placing incriminating evidence at risk of

concealment or destruction. The Fourth Amendment does not require such a gamble.

*Petitioner argues, however, that Belton will fail to provide a "bright-line" rule if it applies to more than vehicle "occupants." Brief for Petitioner 29–34. But Belton allows police to search the passenger compartment of a vehicle incident to a lawful custodial arrest of both "occupants" and "recent occupants."* 453 U.S. at 460, 101 S.Ct. 2860, 69 L.Ed.2d 768. Indeed, the respondent in *Belton* was not inside the car at the time of the arrest and search; he was standing on the highway. *In any event, while an arrestee's status as a "recent occupant" may turn on his temporal or spatial relationship to the car at the time of the arrest and search, it certainly does not turn on whether he was inside or outside the car at the moment that the officer first initiated contact with him.*

*Id.* at 621–22, 124 S.Ct. 2127 (emphasis added).

Ultimately, appellant, in arguing that the search of his jacket "clearly falls outside the scope of *Belton*," relies on the facts that: (1) he was not under arrest nor suspected of being involved in any criminal wrongdoing prior to the search of his coat (2) the search was not required for the purpose of officer safety; and (3) the search was unnecessary to prevent evidence of the crime from being destroyed. The State, initially acknowledging that "there does not appear to be a Maryland case directly on point," nevertheless argues that "a number of jurisdictions have squarely addressed this issue," and directs us to several decisions from sister jurisdictions.

The California Supreme Court, in *People v. Mitchell*, 36 Cal.App.4th 672, 42 Cal.Rptr.2d 537 (1995), in discussing whether the Fourth Amendment is implicated as to so-called "third parties," opined:

"[T]hird-party ownership of the auto or 'containers' therein would not necessarily prevent the arrestee from gaining access to those items. It should not, therefore, bar the police from searching them in the same manner as if they were owned by the arrestee. The Supreme Court has

observed that the justification for this type of search is 'not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have.' *Belton, supra,* 453 U.S. at 461, 101 S.Ct. at 2864. *So too, we think that the arrest justifies the reasonable infringement on any privacy interest that another passenger in the automobile may have in that container."* *Staten v. U.S.,* [562 A.2d 90, 92 (1989)] We agree and note such a conclusion is consistent with the Supreme Court's goal in *Belton* to create a bright-line rule: "In short, '[a] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.' [Citation.]" (*Belton, supra,* 453 U.S. at 458, 101 S.Ct. at 2863.)

*People v. Mitchell,* 36 Cal.App.4th 672, 676, 42 Cal.Rptr.2d 537, 539–40 (1995)(emphasis added).

The Supreme Court of Colorado in *People v. Kirk,* 103 P.3d 918, 922 (2005), recently held that *"a police officer may search the belongings of a passenger after the vehicle's driver has been arrested* if the items are in the vehicle when the search is made." *People v. McMillon,* 892 P.2d 879, 883 (Colo.1995) (citing *Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 and several subsequent state and federal cases).

The Fifth District Court of Appeal of Florida reviewed a passenger's claim, in *State v. Loftis,* 568 So.2d 121, 122 (1990), where the officer discovered cannabis inside an open purse located on the front floorboard on the passenger side. The Court concluded:

According to the Supreme Court in *Belton,* "... when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." Moreover, the officer may examine the contents of containers found within the passenger compartment which are considered to have been within reach of the

arrestee. *Belton,* 101 S.Ct. at 2864. The Court pointed out that this holding was consistent with the requirement in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), that the object searched be "within the arrestee's immediate control." *Belton,* 101 S.Ct. at 2865. *Belton* established a bright-line test of what is in an automobile occupant's immediate control: *the entire passenger compartment of the automobile.* (Emphasis added).

The Fourth District Appellate Court of Illinois, in its interpretation of the *Belton* decision, explained in *People v. Morales,* 343 Ill.App.3d 987, 279 Ill.Dec. 183, 799 N.E.2d 986, 990 (2003):

[i]n so holding, the [*Belton*] Court reiterated that "a lawful custodial arrest creates a situation which justifies the contemporaneous search without a warrant of the person arrested and of the immediately surrounding area. Such searches have long been considered valid because of the need 'to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence." *Belton,* 453 U.S. at 457, 101 S.Ct. at 2862, 69 L.Ed.2d at 773, quoting *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694 (1969).

*Belton* thus essentially held that *the entire passenger compartment lies within the reach of the arrested occupant. By so holding, Belton sought to provide a workable "bright-line" rule for police and thereby "avoid case-by-case evaluations of whether the arrestee's area of control within the automobile extended to the precise place where the officer found the weapon or evidence." People v. Stehman,* 203 Ill.2d 26, 34, 270 Ill.Dec. 426, 783 N.E.2d 1, 5 (2002). The *Belton* Court also noted that " '[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the [f]ourth [a]mendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.' "

*Id.* at 991 (citation omitted)(emphasis added).

The *Morales* Court continued:

Although *Houghton* involved a vehicle search based on probable cause, courts have applied its reasoning, in conjunction with *Belton,* when faced with the issue now before us-namely, whether, upon the lawful arrest of the operator of a vehicle, a warrantless search incident to that arrest may properly extend *to a container situated in the passenger compartment of the vehicle when that container belongs to a passenger who has not been arrested at the time of the search. See, e.g., State v. Tognotti,* 663 N.W.2d 642, 648 (N.D.2003) (holding that incident to the valid arrest of a car's occupant, the arresting officer could search the contents of a *nonarrested occupant's purse that was voluntarily left inside the car* and citing relevant cases). We agree with this analysis.

*Houghton* well articulates the need for maintaining clear and workable rules for police searches, and we conclude that imposing a restriction on vehicle searches incident to arrest based on ownership of containers or other articles left inside the vehicle would "unnecessarily dim" *Belton's* bright-line rule.

*Id.* at 995–96 (citation omitted)(emphasis added).

The Supreme Court of Nebraska, in an in-depth analysis of the rationale for permitting a search of items belonging to the passenger, reasoned, in *State v. Ray,* 260 Neb. 868, 620 N.W.2d 83, 87–88 (2000):

This case is factually distinguishable from *Belton* in that Ray, the owner of the property seized during the vehicle search, *had not been arrested prior to the search. Thus, the question presented is whether, upon the lawful arrest of the operator of a motor vehicle, a warrantless search incident to that arrest may properly extend to a container situated in the passenger compartment of the vehicle which belongs to a passenger who has not been arrested at the time of the search.* In resolving this question in the affirmative, the Court of Appeals relied upon the reasoning of *Wyoming v. Houghton,* 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). In that case, an officer stopped a vehicle for speeding. While talking to the driver, the officer noticed a

hypodermic syringe in the driver's shirt pocket, and upon inquiry, the driver replied that he used the syringe to take drugs. The officer then ordered two female passengers out of the car. On the strength of the driver's incriminating admission, the officer searched the passenger compartment of the car for contraband and in doing so, found a purse on the back seat belonging to Houghton, one of the passengers. The officer discovered methamphetamine and drug paraphernalia inside the purse. In addressing the validity of the search of the purse, the Supreme Court noted the uncontroverted fact that the officer had probable cause to believe there were illegal drugs in the car. The Court noted its holding in *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), wherein it determined that "[i]f probable cause justifies the search of a lawfully stopped vehicle, *it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.*" Recognizing that under the facts of *Ross* it was not claimed that the package searched belonged to anyone other than the driver, the Court nevertheless reasoned that "if the rule of law that *Ross* announced were limited to contents belonging to the driver, or contents other than those belonging to passengers, one would have expected that substantial limitation to be expressed." *Houghton,* 526 U.S. at 301–02, 119 S.Ct. 1297, 143 L.Ed.2d 408. The Court further reasoned that "[a] *passenger's personal belongings, just like the driver's belongings or containers attached to the car like a glove compartment, are 'in' the car, and the officer has probable cause to search for contraband in the car."* (Emphasis in original.) 526 U.S. at 302, 119 S.Ct. 1297, 143 L.Ed.2d 408. In addition, the Court held "[p]assengers, no less than drivers, possess a reduced expectation of privacy with regard to the property that they transport in cars . . . ." 526 U.S. at 303, 119 S.Ct. 1297, 143 L.Ed.2d 408. The Court distinguished cases involving the search of a passenger's person, which it found to hold a significantly heightened protection, from searches of a passenger's belongings. *See United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). The Court also found that a

"criminal might be able to hide contraband in a passenger's belongings as readily as in other containers in the car." *Houghton,* 526 U.S. at 305, 119 S.Ct. 1297, 143 L.Ed.2d 408. (Emphasis added).

Finally, *Ray* deemed not insignificant the potential for mischief where there may be complicity between a vehicle's occupants, but no observable conduct:

Rejecting the rationale applied by the Wyoming Supreme Court in determining the search to be invalid, the Supreme Court reasoned:

To require that the investigating officer have positive reason to believe that the passenger and driver were engaged in a common enterprise, or positive reason to believe that the driver had time and occasion to conceal the item in the passenger's belongings, surreptitiously or with friendly permission, is to impose requirements so seldom met that a "passenger's property" rule would dramatically reduce the ability to find and seize contraband and evidence of crime. Of course these requirements would not attach (under the Wyoming Supreme Court's rule) until the police officer knows or has reason to know that the container belongs to a passenger. But once a "passenger's property" exception to car searches became widely known, one would expect passenger-confederates to claim everything as their own. And one would anticipate a bog of litigation-in the form of both civil lawsuits and motions to suppress in criminal trials-involving such questions as whether the officer should have believed a passenger's claim of ownership, whether he should have inferred ownership from various objective factors, whether he had probable cause to believe that the passenger was a confederate, or to believe the driver might have introduced the contraband into the package with or without the passenger's knowledge. *Wyoming v. Houghton,* 526 U.S. 295, 305–06, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)(emphasis added).

*Id.* at 88 (emphasis added).

Notwithstanding that Maryland has yet to extend the *Belton/Thornton* bright line test specifically to the search of items

belonging to a passenger situated several feet from the vehicle arguably outside of the *Chimel* reach, who is neither under arrest or suspected of criminal activity at the time of the search and who neither poses a threat to the officer's safety or is capable of destroying evidence, we believe that the reasoning of the Supreme Court of Nebraska has divined the clear direction of the Supreme Court in *Belton* and *Thornton.* It is the whole of the passenger compartment that is subject to search, including any items or containers and the content thereof, belonging to the driver or an occupant regardless of whether he or she has been placed under arrest or is within or has been ordered out of the vehicle.

As the above passage indicates, the arrestee there, a passenger like Purnell, challenged the seizure of contraband situated in the passenger compartment of the vehicle upon the lawful arrest of the operator of the vehicle. As the *Ray* decision concluded, citing the Supreme Court's decision in *Houghton,* the passenger's personal belongings, like the driver's belongings or containers attached to the car, are "in" the car and, thus, the officer has probable cause to search for contraband in the car. The *Ray* Court further noted that *Houghton* declared passengers and drivers alike possess a reduced expectation of privacy with regard to property that they transport in their cars. Conversely, *Ray* recognized that cases involving the search of a passenger's *person* hold a significantly heightened protection and are to be distinguished from searches of a passenger's belongings.

Appellant, to be sure, posed no threat to obtain a weapon or destroy evidence as he was seated on the ground near the vehicle. Nor was he under arrest or suspected of having committed any crime. His coat, however, was situated within the passenger compartment of the vehicle, which fact brings the contents of his jacket pocket within the ambit of the rule that a search incident to arrest provides probable cause to search for contraband in the vehicle. Under *Ray* and *Houghton,* appellant's Fourth Amendment challenge would have had merit had the officer searched his coat pockets while he was

wearing it. The court properly denied appellant's motion to suppress.

■ Alternatively, appellant asks that we ". . . look to Art of 26 of the Maryland Declaration of Rights to provide the citizens of Maryland with greater protection than that which has been afforded under federal law." He adds, "To do so would reaffirm the independent validity of the State Constitution and the growing trend among states toward 'new federalism.' " Citing *Givner v. State,* 210 Md. 484, 124 A.2d 764 (1956), appellant reminds us that, "While the wording of Article 26 differs from that of the Fourth Amendment, it 'has been construed as a limitation upon the power of the Legislature to pass any law, or the courts to issue any process, which would violate that Article.' "

Article 26 of the Maryland Declaration of Rights provides:
That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

■ Although appellant correctly points out that Article 26 need not be construed *in pari materia* with the Fourth Amendment of the United States Constitution and the Supreme Court's construction of that amendment, *Gahan v. State,* 290 Md. 310, 430 A.2d 49 (1981), he hastens to acknowledge that "for the most part" such a construction is favored. *Scott v. State,* 366 Md. 121, 782 A.2d 862 (2001); *Gadson v. State,* 341 Md. 1, 668 A.2d 22 (1995).[2]

In support of his argument that we should decline to construe Article 26 of the Maryland Declaration of Rights *in*

---

**2.** *See also State v. Cronin,* 2 Neb.App. 368, 509 N.W.2d 673, 675 (1993) (holding that although the prohibition against unreasonable searches and seizures in the federal Constitution is textually identical to that found in article I, § 7, of the Nebraska Constitution, it is well established that a state may interpret its own constitution to offer greater protection of individual rights than does the federal Constitution.)

*pari materia* with the Fourth Amendment, appellant cites *Gahan v. State,* 290 Md. 310, 322, 430 A.2d 49 (1981), for the proposition that "although a clause of the United States Constitution and one in our own Declaration of Rights may be *'in pari materia,'* and thus 'decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent; violation of one is not necessarily a violation of the other.'" More pertinent to the issues before us is *Davis v. State,* 383 Md. 394, 859 A.2d 1112 (2004), in which the Court of Appeals recognized that, "Article 26 of the Maryland Declaration of Rights has a like, though perhaps not identical, purpose and effect, to prohibit unlawful searches and seizures and is subject to a like, but not identical interpretation." (Internal citations omitted).

In his most cogent assail on constructing Article 26, *in pari materia* to the Fourth Amendment, appellant seeks succor in the decision of the Supreme Court of New Jersey in *State v. Eckel,* 185 N.J. 523, 888 A.2d 1266, 1276–77 (2006):

In this matter our concern is the search incident to arrest exception. As we have indicated, both our prior case law and federal case law have recognized the specific contours of that exception: *it is invocable to ensure police safety or to avoid the destruction of evidence. See Chimel, supra, 395 U.S. at 762–63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694; State v. Welsh,* [ 84 N.J. 346, 355, 419 A.2d 1123] *(stating, "[t]he relevant facts, then, appear to be those which disclose what places the person under arrest presently could reach at the time the arrest is undertaken and how likely it is that he would attempt resistance or escape or destruction of evidence"); State v. Pierce,* [136 N.J. 184, 211, 642 A.2d 947] (stating, "[w]e reject not the rationale of *Chimel,* but *Belton*'s automatic application of *Chimel* to authorize vehicular searches following all arrests for motor-vehicle offenses").

However, in *Belton,* and later in *Thornton,* the Supreme Court altered *Chimel,* establishing *a bright-line rule that essentially validates every automobile search upon the occupant's arrest, regardless of whether the occupant has the capacity to injure the police or destroy evidence.* In con-

cluding as it did, *Belton* detached itself from the theoretical underpinnings that initially animated the search incident to arrest exception. Unmoored as it is from *Chimel* and established Fourth Amendment jurisprudence, all that is left in *Belton* is the benefit to police of a so-called bright line rule. *See, Belton, supra,* 453 *U.S.* at 464, 101 S.Ct. at 2865, 69 L.Ed.2d at 777 (Brennan, J., dissenting). Without question, along with protecting privacy and "regulat[ing] the distribution of power between the people and the government," guiding the police is one distinct level on which the Fourth Amendment operates. *The Supreme Court, 1980 Term,* 95 *Harv.L.Rev.* 93, 258 (1981). However, it cannot, standing alone, support an exception to the warrant requirement. By focusing solely on procedure and writing out of the exception the two *Chimel* justifications, the Supreme Court in *Belton* reached a result that is detached from established Fourth Amendment jurisprudence.

*We decline to adopt Belton and its progeny because to do so would require us to accept a theoretically rootless doctrine that would erode the rights guaranteed to our own citizens by Article I, Paragraph 7 of our constitution-the right to be free from unreasonable searches and seizures. To us, a warrantless search of an automobile based not on probable cause but solely on the arrest of a person unable to endanger the police or destroy evidence cannot be justified under any exception to the warrant requirement and is unreasonable.*

We do not view Article I, Paragraph 7 as a procedural matter but as a reaffirmation of the privacy rights guaranteed to our citizens and of our duty as judges to secure them. So viewed, the *Belton* rationale simply does not pass muster. That is not to suggest that bright lines are not salutary, only that they cannot be the sole justification for a warrantless search. Indeed, a bright-line that remains true to an exception's roots is a worthy consideration. In that connection, one scholar has observed:

If any bright line rule had been necessary to resolve the issue in *Belton,* it would have been the opposite of the

rule that the Court announced.... [O]ccupants almost invariably are removed before an automobile is searched; and once they have been removed, there is no longer much chance that they can secure weapons from the automobile or destroy evidence there.

[Albert W. Alschuler, *Bright Line Fever and the Fourth Amendment*, 45 *U. Pitt. L.Rev.* 227, 274 (1984).]

That is the line we draw here. *Once the occupant of a vehicle has been arrested, removed and secured elsewhere, the considerations informing the search incident to arrest exception are absent and the exception is inapplicable.* We thus return to *Chimel* and to *Welsh* and declare their reasoning to be the critical path to the application of the search incident to arrest exception under Article I, Paragraph 7 of our constitution. That, in turn, answers the open issue in *Pierce*.

Obviously, where a defendant has been arrested but has not been removed and secured, the court will be required to determine, on a case-by-case basis whether he or she was in a position to compromise police safety or to carry out the destruction of evidence, thus justifying resort to the search incident to arrest exception. (Emphasis added).

Appellant's earlier Fourth Amendment argument essentially tracks the above excerpt from *Eckel*, *i.e.*, "The search ... was not required for the purpose of officer safety, nor was it necessary to prevent evidence of the crime from being destroyed." In addition to his complaint regarding the extension of the concept of "reach" explicated in *Chimel*, appellant had complained that the only basis for probable cause was the fact that appellant rode in a vehicle in which the driver's operator's license had been suspended, and, "there was certainly no evidence in [appellant's] coat pocket regarding that crime." Of note, pertinent to our determination of whether Article 26 and the Maryland declaration of rights is *in pari materia* to the Fourth Amendment, the New Jersey Supreme Court, in *Eckel*, acknowledged that it had taken a position contrary to that expressed by the Court in *Belton* and *Thornton*. In so doing, it determined that Article I, Paragraph 7 of the New

Jersey Constitution, guaranteeing the right to be free from unreasonable searches and seizures, was at odds with the lowered expectation of privacy *under Belton* and *Thornton.* It clearly was within the authority of the New Jersey Supreme Court to make that decision. As appellant concedes, however, Maryland does not favor a construction of Article 26 that is not in *pari materia* with the Fourth Amendment.

As the Court of Appeals ultimately held in *Gahan*, 290 Md. at 322, 430 A.2d 49:

> What the Supreme Court said in *Salvucci* and *Rawlings*, a case which did involve an alleged narcotics violation, is closely similar to the prior statements of this Court. We now hold in accordance with *Salvucci* that one who seeks under Art. 26 to challenge the validity of a search and seizure must establish that his own rights have in fact been violated. As the Supreme Court put it in *Rawlings*, there is but one inquiry to be made, *"whether governmental officials violated any legitimate expectation of privacy held by (the accused)." Id.* 448 U.S. at 106, 100 S.Ct. at 2562. The findings of the trial judge as to a lack of an expectation of privacy under the Fourth Amendment are equally applicable to alleged violation of Maryland Declaration of Rights, Article 26. Hence, we find no error. (Emphasis added).

The dissident voice of the *Eckel* Court deftly expresses the view that expanding the *Chimel* definition of what constitutes reasonableness in a warrantless search beyond what is necessary to ensure police safety or avoid the destruction of evidence does not pass constitutional muster. We cannot say that the court's reasoning rings hollow. We are guided, however, by the *Gahan* test that, in seeking to invoke Article 26 of the Maryland Declaration of Rights, the accused must demonstrate that his/her legitimate expectation of privacy has been violated by government officials. We hold that the recovery of contraband in appellant's coat pocket, situated in the passenger compartment of the vehicle, after he was ordered out of the vehicle and remained seated on the ground, does not constitute a violation of his legitimate expectation of privacy.

## II

Appellant next challenges the sufficiency of the evidence to sustain his conviction for possession with intent to distribute cocaine. In support of this contention, he argues in his brief:

In this case, the State relied heavily on the quantity of narcotics found. In having done so, the State seems to have ignored the fact that at the time of the stop, Officer Peach had no reason to believe that [appellant] was in possession [of] controlled dangerous substances. Nor was there any paraphernalia, tally sheets, cell phones, or large amounts of cash recovered. [Appellant] was simply the passenger in a car that was stopped because the license plate was [not] properly affixed when he [was] detained and his jacket was searched. Under such circumstances, the quantity of the drugs recovered, standing alone, is insufficient to establish an intent to distribute.

\* \* \*

Detective Massoni's inability to conclusively testify that the 2.3 grams of cocaine was inconsistent with personal use, created a reasonable hypothesis of innocence. *See Wagner, supra.* In this case, the facts support the reasonable hypothesis that [appellant] was using cocaine rather than distributing it.

Under these circumstances, the State failed to produce sufficient evidence to allow a rational trier of fact to find beyond a reasonable doubt that appellant possessed cocaine with the intent to distribute. [Appellant] did not have, at the time of his arrest, any owe sheets, scales to weigh out portions, packing material with symbols or labels, or money in any denomination. Most importantly, Detective Massoni testified that it was possible for [appellant] to have the 2.3 grams of cocaine, which were recovered from the jacket, for personal use. As such, no rational trier of fact could have found beyond a reasonable doubt that [appellant] possessed the cocaine with the intent to distribute. Rather, the evidence is more consistent with drug possession for personal use.

## STANDARD OF REVIEW

 The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). This inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.; see Woodby v. INS,* 385 U.S. at 282, 87 S.Ct. at 486. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law. *Id.*

## ANALYSIS

 Detective Massoni testified, upon his *voir dire,* that he had been a member of the CDVIT unit for eleven years, that he had been employed for seventeen years in law enforcement, and that he had training in drug recognition. The court accepted Detective Massoni as an expert "in the area of packaging, recognition and distribution of cocaine." He testified that the twelve yellow ziplock baggies of cocaine, with a total weight of 2.3 grams and marijuana, with a weight of 8.3 grams, recovered from appellant's coat were "common packaging" for cocaine distribution and that each bag had a street value of twenty dollars; thus, the illegal drugs appellant possessed had an aggregate value of $240. The Detective further testified that the amount of crack cocaine found in appellant's coat was not consistent with personal use and indicated that, in his opinion, appellant possessed it "[f]or

distribution." Detective Massoni testified relative to the charge of possession with intent to distribute:

the number of baggies, the way they're packaged in smaller amounts and they're being carried in another bag, is the way they—you know, usually they're trying to conceal it away from the police. People that are going to purchase amounts for their own use don't usually buy twelve bags at a time and conceal them in that nature. There's usually some paraphernalia somewhere on the person. The majority of the people we've arrested that are purchasing have paraphernalia somewhere on them, a pipe of some sort, or in the vehicle.

To purchase this amount, I mean, they could get a larger quantity for the same amount of money, if they were savvy and they want their money to go further, for somebody that's going to be using.

\*　　\*　　\*

Q: The fact that in this case the defendant is found with two grams plus of cocaine and 8.3 grams of marijuana, is that consistent or inconsistent with somebody who uses it in that regard that you just described?

A: Like I said, I've only dealt with it once before, so I don't know how often they would use it in that respect. I mean, it seems like an awful lot of cocaine to be used in that respect for one person, anyway.

\*　　\*　　\*

Q: So if in this case—the bottom line, if in this case the defendant were to maintain that he is a user and that the twelve bags on him were for his personal use and not to distribute or [sell] or dispose of, would you say that that's just—that's not consistent with your experience, but it could be or just could not possibly be?

A: Now, if that's what he wanted to testify to, I mean, that's—but from what I've dealt with in that area, that's not consistent.

Q: Is it possible?

A: It could be possible.

Following the *voir dire* examination of Detective Massoni, the Court ruled:

I find Detective Frank Massoni has specialized training and experience in the area of packaging, recognition and distribution of cocaine. He's also described his interactions with drug users and abusers over the seventeen years he's been in law enforcement, eleven in particular or ten and a half with the CDVIT unit. And the court finds that his testimony on all of those areas would be helpful in understanding the evidence in this case, and so I do find he's qualified as an expert in those areas. In terms of weight of the testimony, that is up to me.

Md.Code, Criminal Law Article § 5–602, "manufacturing, distributing, possession with intent to distribute, or dispensing controlled dangerous substance," provides:

Except as otherwise provided in this title, a person may not:

(1) manufacture, distribute, or dispense a controlled dangerous substance; or

(2) possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to manufacture, distribute, or dispense a controlled dangerous substance.

The motions court indicated, in ruling on the motion to dismiss, that it found the testimony of Detective Massoni "very helpful" in reaching its determination that the twelve bags of cocaine were packaged in a manner that is consistent with distribution. Although no indicia of drug distribution, such as "some type of sheet" or scales, was found, the court concluded, neither did the vehicle belong to the defendant. Because appellant "was catching a ride with this young lady who was a friend of his," the court surmised, "I don't know that I would necessarily expect those types of things to be found in a vehicle." Noting that the twelve bags of crack cocaine were contained in individual $20 bags which were, in turn, contained in another bag, the motions court concluded: "Nothing was found that would be consistent with him simply

being a user of crack cocaine . . . if the defendant were truly a user, it would have made more sense for him to buy an eighth of an ounce or a lesser amount."

▆▆▆▆▆ In Maryland, no specific quantity of drugs has been delineated that distinguishes between a quantity from which one can infer and a quantity from which one cannot make such an inference. *Collins v. State*, 89 Md.App. 273, 279, 598 A.2d 8 (1991); *Gipe v. State*, 55 Md.App. 604, 617–18, 466 A.2d 40 (1983). "The quantity of drugs possessed is circumstantial evidence of intent." *Id.* (citing *Anaweck v. State*, 63 Md.App. 239, 255, 492 A.2d 658, *cert. denied*, 304 Md. 296, 498 A.2d 1183 (1985), *overruled on other grounds, Wynn v. State*, 351 Md. 307, 718 A.2d 588 (1998)). "Intent to distribute controlled dangerous substances is 'seldom proved directly, but is more often found by drawing inferences from facts proved which reasonably indicate under all the circumstances the existence of the required intent.' " *Salzman v. State*, 49 Md.App. 25, 55, 430 A.2d 847 (1981) quoting *Waller v. State*, 13 Md.App. 615, 618, 284 A.2d 446 (1971), *cert. denied*, 264 Md. 752 (1972). "And the very quantity of narcotics in possession may indicate an intent to distribute." *Salzman*, 49 Md.App. at 55, 430 A.2d 847 (citing *State v. Beers*, 21 Md.App. 39, 318 A.2d 825 (1974)).

In his claim of insufficiency of the evidence to prove intent distribute, appellant relies heavily on our decision in *Herbert v. State*, 136 Md.App. 458, 463, 766 A.2d 190 (2001), in which we said:

[t]he appellants were convicted not of simple possession, but of possession of cocaine with intent to distribute or dispense. *There are various ways to prove such intent.* The statutory language itself strongly suggests one route to the permitted inference of intent when it speaks of possession "in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance." Art. 27, § 286(a)(1). *The quantity of narcotics possessed,* however, is not an end in

itself; it *is but evidence of intent.* It is the intent itself that is critical....

Thus, even a large quantity of drugs might not yield a finding of intent to distribute, if other circumstances indicated large private consumption. *Conversely, a much smaller quantity might yield such finding of intent, if evidence other than the quantity possessed showed that intent.*

(Emphasis added). *See also Collins v. State,* 89 Md.App. 273, 279, 598 A.2d 8 (1991).

Here there was "evidence other than the quantity possessed [that] showed that intent." The incremental *mens rea* of an intent to distribute on the part of **SOMEONE** was abundantly established in this case.

*Id.* at 463, 766 A.2d 190.

Appellant relies on our statement in *Herbert* that, "The quantity of narcotics possessed, however, is not an end in itself; it is but evidence of intent." More recently, we considered whether the possession of several rocks of crack cocaine weighing 1.5 grams with a total street value of $150, in circumstances similar to those in the case at hand, was sufficient evidence of intent to distribute. *Johnson v. State,* 142 Md.App. 172, 788 A.2d 678 (2002). There, the crack cocaine was found inside a pocket in Johnson's jeans during a search at the police station. "[A]n expert 'in the field of packaging, pricing and the mechanics of distribution of drugs' in the subject geographical area" was produced by the State. *Id.* at 205, 788 A.2d 678. At trial, he was shown the crack cocaine that had been discovered on appellant's person. The total value of the cocaine, he estimated, was at least $150, and the cocaine had "been broken up into various sizes of rocks." *Id.* He added, "The sizes that I see in the bag vary from what they call a crumb, a $5 or $10 piece. There are numerous $20 pieces. And there is a larger rock that I see in here that probably would sell for $40." *Id.* The expert concluded that, in his opinion, the intended use of the crack cocaine found on

Johnson was " '[f]or sales and distribution on the street.' " *Id.* Johnson presented no testimony refuting this testimony.

In upholding Johnson's conviction, we opined:

Johnson contends that the evidence was insufficient to sustain his conviction for possession of cocaine with intent to distribute. He argues that his conviction was based solely on the quantity of crack cocaine in his possession-an amount he maintains is not necessarily consistent with an intent to distribute. He points out that no other evidence was found indicating his intent to distribute.

When charged with the intent to distribute, the element of intent is generally proved by circumstantial evidence. *Fontaine v. State,* 135 Md.App. 471, 479, 762 A.2d 1027 (2000) (citations omitted). The amount of crack cocaine found on appellant's person "permits, although does not demand, an inference that appellant intended to distribute the ... crack cocaine." *Collins v. State,* 89 Md.App. 273, 279, 598 A.2d 8 (1991).

As to proof of intent, we have stated that *an intent to distribute controlled dangerous substances is seldom proved directly, but is more often found by drawing inferences from facts proved which reasonably indicate under all the circumstances the existence of the required intent. Likewise, an intent to distribute may be indicated by the very quantity of narcotics possessed.*

*Smiley v. State,* 138 Md.App. 709, 716, 773 A.2d 606 (2001) (citations omitted).

Appellant says that the quantity that he possessed "was not gargantuan," as he "had only 1.5 grams." He even goes further, as he proceeds to give us a lesson in arithmetic, informing us that "[a] gram is approximately the weight of 1/28th of an ounce. There are 16 ounces in a pound. A gram is, therefore, 1/448th of a pound." Certainly, we are grateful for this lesson, but we point out to appellant that everything in life is relative. The amount Johnson possessed may not seem like a large amount to him, but it certainly does to us. We have already reproduced that

which the trial judge said when he announced the verdict. We again quote a portion of that finding, as it effectively addresses this contention by appellant:

> The verdict is based upon the fact that the evidence discloses that the Defendant was in direct personal possession secreted on his person of *ten times* what is probably the most common unit of packaged crack cocaine. The common sale in my experience in the last 12 years sitting here is that most people pull up and ask if they are looking, if they are connected, all that other talk. They want a 20. And they buy a 20 or they buy a 40. They very seldom pull up and say, give me 1.5 grams, give me $150 or $200 worth.

> \* \* \*

"In Maryland, no specific quantity of drugs has been delineated that distinguishes between a quantity from which one can infer and a quantity from which one cannot make such an inference" of an intent to distribute. *Collins,* 89 Md. App. at 279, 598 A.2d 8.

Johnson argues that the State's case against him for intent to distribute rested on no more "than an inference arising from quantity." This assertion conveniently disregards the consideration applied to the manner in which the crack cocaine had been broken down. Even when the quantity of drugs does not, in and of itself, demonstrate an intent to distribute, other circumstantial evidence may be introduced to prove intent. *Id. Here, the manner in which the various rocks of crack cocaine were divided also indicated his intent to distribute.*

The trial court accepted Captain Robert L. Hobbs, Jr. as an expert "in the field of packaging, pricing and the mechanics of distribution of drugs" in the subject geographical area. At trial, Hobbs was shown the crack cocaine that had been discovered on appellant's person. *He testified that the total value of the cocaine was at least $150, and that it had "been broken up into various sizes of rocks. The sizes that I see in the bag vary from what they call a crumb, a $5 or $10*

*piece. There are numerous $20 pieces. And there is a larger rock that I see in here that probably would sell for $40." Hobbs concluded that in his opinion the intended use of the crack cocaine found on appellant was "[f]or sales and distribution on the street."* Johnson presented no testimony refuting these findings by Hobbs.

*Id.* at 203–204, 788 A.2d 678 (emphasis added).

Central to our decision in *Johnson* was the role of the fact finder in assessing the credibility of the witnesses and the weight to be accorded the evidence. The fact finder has the discretion to decide which evidence to credit and which to reject. *Johnson,* 142 Md.App. at 205, 788 A.2d 678 (citing *Velez v. State,* 106 Md.App. 194, 202, 664 A.2d 387 (1995)). "Contradictions in testimony or determinations of credibility go to the weight of the evidence, and not to its sufficiency." *Id.* (citing *Binnie,* 321 Md. at 580, 583 A.2d 1037; *Smiley,* 138 Md.App. at 719, 773 A.2d 606).

With the foregoing in mind and further mindful that, under Maryland Rule 8–131(c), we defer to the factual findings of the trial judge in a nonjury case, unless they are clearly erroneous, giving due regard to the opportunity of the trial judge to observe the demeanor of the witnesses and to assess their credibility, *Wilson v. State,* 319 Md. 530, 535–37, 573 A.2d 831 (1990), we turn to appellant's claim of insufficiency of the evidence.

We begin by observing that the trial judge made an express finding that the testimony of the expert was "very helpful in evaluating the evidence in the case." Detective Massoni explained that packaging the cocaine in smaller bags which are then placed in a larger bag is usually done to conceal the illicit drugs from detection by the police. When purchasing illegal drugs for one's personal use, he testified, the buyer would not normally purchase twelve bags at a time, concealing them as was done in this case. Finally, a purchaser could obtain a larger quantity for the same amount of money if drugs were intended for his/her personal use.

The trial court, like the judge in *Johnson*, supra, was entitled to factor in the information provided by the expert witness regarding the practice of drug dealers in packaging drugs for sale on the street. The quantity of illicit drugs seized from appellant was substantially more than that recovered in *Johnson*. Appellant had 2.3 grams of cocaine and 8.3 grams of marijuana with an aggregate value of $240 on his person, whereas the quantity seized in *Johnson* was 1.5 grams, with a total street value of $150. In consideration of all of the permissible inferences deducible from the above facts, we hold that the evidence adduced by the State was sufficient to reasonably indicate under all the circumstances the existence of the required intent.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**